RUNGE, Plaintiff in error, vs. THE STATE, Defendant in error.

*January 15—February 9, 1915.*

*Criminal law: Homicide: Evidence: Motive: Uxoricide: Relations between spouses: Hearsay: Declarations of wife: Prejudicial errors: Instructions to jury: Descent of wife's property: Use of short-hand notes by witness.*

1. Upon a trial for murder where the evidence is wholly circumstantial and is not conclusive of guilt the question of motive becomes one of great importance and may turn the scale either way, depending upon the probative force of the evidence relating to it.

2. Upon a trial for uxoricide it is proper for the state to show by competent evidence, as motives for the crime, ill feeling on the part of the defendant towards his wife and a desire on his part to secure her property.

3. How far back, in such a case, the inquiry as to the relations between defendant and his wife should go is a matter largely in the discretion of the trial court, provided there is reasonable connection with their relations down to the time of her death.

4. It was proper in such a case for witnesses to testify as to the condition the deceased seemed to them to be in when in the presence of the defendant, as to being nervous or otherwise.

5. Evidence in such case of statements of the wife as to her relations with the defendant, not made in his presence, are inadmissible, being mere hearsay.

6. The admission of hearsay evidence of that character was in this case a prejudicial error, even under sec. 3072m, Stats., since, in view of the wholly circumstantial nature of the evidence against the defendant, the meagerness of the competent evidence showing unpleasant relations with his wife, the direct bearing of the incompetent evidence so received upon the question of motive, and the express charge of the court that it had an important bearing on that question, it seems quite probable that, had such evidence been excluded, the jury might have reached a different result.

7. It having been claimed that one motive for the uxoricide was defendant's desire to secure his wife's property, he was entitled, upon request, to have the jury instructed as to the law under which, upon her death, her property would descend to other persons.

8. Upon a trial for murder, the official stenographer of the coroner was properly permitted to use his short-hand notes upon the witness stand and to read from them; and another witness was properly permitted to use his notes in testifying to statements made to him by the defendant.

ERROR to review a judgment of the municipal court of Milwaukee county: A. C. BACKUS, Judge. *Reversed.*

June 3, 1912, an information was filed against the plaintiff in error, hereinafter called the defendant, charging him with having on the 12th day of February, 1912, murdered his wife, Anna Runge. He was convicted of the crime of murder in the first degree and on January 31, 1913, was sentenced to imprisonment in the state prison at Waupun for

Runge v. State, 160 Wis. 8.

life.   To test the correctness of such judgment the case is brought here by writ of error.

For the plaintiff in error there was a brief by *W. J. Kershaw* and *Walter Schinz*, attorneys, and *Herbert R. Manger* and *Orin M. Peters*, of counsel, and the cause was argued orally by *Mr. Manger, Mr. Kershaw,* and *Mr. Schinz.*

For the defendant in error there was a brief by the *Attorney General, Edward Yockey,* district attorney, and *J. Elmer Lehr,* special assistant district attorney, and oral argument by *Mr. Lehr.*

VINJE, J.   It appears from the evidence that in 1905 the defendant married Mrs. Anna Kealty, who was the mother of four children by a former marriage, only two of whom, Frank Kealty and Birdie Pott, survive.. After their marriage Frank lived with them for a time.   Later he married and resided a short distance from them.   *Mr.* and Mrs. Runge occupied a house owned by her.   He was employed by the Allis-Chalmers Company and she kept house, occasionally did some wash, ing, and once in a while had domestic help.   When married *Mr. Runge* had about $1,500 in a bank, from which sum he had from time to time drawn small sums to meet extraordinary expenses, as his earnings were not always sufficient to sustain the family.   His wife had no substantial property or money except her home, which consisted of a five-room frame house and lot of small value.

On the afternoon of February 11, 1912, the defendant and his wife spent some time at the home of her mother, and he says they did not return to their own home until about 10:45 in the evening.   It was cold and he gave her a small drink of whisky and peppermint, and they both retired, occupying separate rooms.   About 4 o'clock in the morning he was awakened by the explosion of a lamp they kept burning all night and saw the house on fire from burning oil.   He got up, went to his wife's bedroom, caught her by the arm, and said, "Come, get up, the house is afire," and she replied, "All

Runge v. State, 160 Wis. 8.

right, I am coming." In his statement to the deputy sheriff he tells what further took place as follows:

"I then went back into the sitting room and went to the stove and put on one boot, the left one, which had been left behind the stove to dry. I then went back into the bedroom and said to my wife, 'Come quick, the house is on fire.' She replied, 'All right, I am coming.' She did not make any move to get out of the bed. I then went back to the stove, picked up the pants and put them on partly, then put on my right boot, and then I went back to my wife's bedroom and said to her, 'Come, Annie, the house is on fire.' I shook her by the left arm. Again she replied: 'All right, I am coming.' I got my overcoat out of her room and then went back to the stove and picked up a pair of overalls and tried to put out the fire with them and put them on partly, and then went into my bedroom, bedroom off the parlor, and was overcome by smoke and heat and fell to the floor. I then crawled on my hands and knees to the front door to get some fresh air. After I got a little fresh air I crawled back into my bedroom and pulled out my trunk out of the front door [east side of house], put it a short ways, where it would be safe. I then ran around to the north side of the house to her window, to see if she was there, but it was all afire, and I supposed that she had been to some one of the neighbors. I then hollered 'fire' again, having hollered 'fire' when I pulled the trunk out already. I had also thrown my overcoat and a pair of overalls out of the door at the time when I pulled my trunk out of the east door and then went to the east side of the house and picked up the overcoat and overalls and put the overalls partly on and then threw the overcoat into the chicken house and then went to the window of her room again, to see if I could see her, but it was such a hot place that I could not stand it. I then went to the east side of the house to see if I could save something from the house, but I could not get in, as the flames were coming out of the door. Mrs. Seltrecht and Mr. Derwald had gotten to the house before I pulled my trunk out."

The house burned completely to the ground. A part of the body of Mrs. Runge was found upon the iron springs where her bedroom had been and the remains of her trunk were also found with the lock partly locked and the iron bands that had

been around it partly broken.    The remains of the trunk when found were, as,one witness put it, somewhat "squashed" by falling timbers or from other causes.    A few days after the fire Mr. Kealty broke open the defendant's trunk and in about the center of it, between some clothing, he found his mother's valuable papers, her small savings bank, insurance papers, pocketbook, bank book, and other belongings of hers that had always been kept in her own trunk under lock and key.    The defendant claimed his wife had given them to him to keep.    The key to her trunk was carried by her on a string tied around her neck, and was found in the *débris* near her body, and unlocked the lock when inserted therein after the fire.

The evidence convicting the defendant was wholly circumstantial.    A strong plea is made that it is not sufficient to sustain the verdict.    While not being able to come to that conclusion, we realize that the case is a close one, and that the jury might well have acquitted defendant on the ground that the evidence did not possess the convincing degree of proof required in criminal cases.    They having, however, been satisfied by it, we cannot say there was no warrant in it for such a conclusion.    Since there must be a new trial for error in the admission of evidence and refusal to charge as requested, we forbear to comment further upon the probative force of the evidence.

As before stated, it was wholly circumstantial and not so conclusive but that a different result might have been reached by the jury.    In such a situation the question of motive becomes one of great importance, and may well turn the scale either way, depending upon the probative force of the evidence relating to it.    In the present case the state sought to show two motives: (1) ill feeling on the part of defendant towards his wife, and (2) a desire on his part to secure her property.    It was of course perfectly proper to show both by competent evidence.    The state was entitled to show what

had been the relations between the defendant and his wife prior to the alleged uxoricide. *Hedger v. State,* 144 Wis. 279, 128 N. W. 80. And it was a matter resting largely in the discretion of the trial court how far back such inquiry should go, provided it was reasonably connected with their relations down to the time of the fire. There was some competent testimony given by Frank Kealty and the sisters of the deceased that the relations between defendant and his wife were not always pleasant; that at times he was morose and scolded, and had even been seen to kick the chairs about. But the evidence did not show a very unusual state existing between people married so late in life. It was not shown that he had ever beaten her or threatened to do so. It is in evidence that the evening before the fire both were in good humor and Mrs. Runge was jolly. There is also testimony by a woman who assisted Mrs. Runge with the washing and remained in the household for considerable periods of time that the relations between them were not unpleasant.

A number of witnesses were permitted, over defendant's objections, to testify to statements made to them by Mrs. Runge in the absence of the defendant, as to their relations. The following are fair samples of such testimony:

Clara A. Jackson, a sister of the deceased, testified: "Why, she came that evening and asked me if I would go home with her, she was late for supper, and she asked me if I would go home with her to help her prepare supper because she was afraid of him, if she wouldn't have his supper ready in time for him when he got home." Mary Washburn, a sister of deceased, testified: "Well, she told me that she couldn't stand him much longer, and she wanted me to go with her and hunt up some lawyer, and get a divorce." And again: "She said that there was times when he came home that she was afraid of him, and that she had to watch him." Later she testified: "Why, she said that she was always quarreling with *Wenzel* because he wanted her property and she wouldn't sign it over

to him. Now, I can't tell it any other way." Birdie Potts, a daughter of deceased, testified: "She told me he was so stingy to her, she had to keep all her accounts just to such a mark, and he kept account of everything, every article of groceries bought, and would complain if she got any more than she just absolutely got along with." Frank Kealty, a son of deceased, testified: "She said that he had acted mean and cross that morning [about January 26, 1912] when he left for work, that she couldn't stand it much longer." And Emanuel Meyerhoff testified: "She told me the first conversation we had, she told me when she married him, she got the cat in the bag, and of course one word led to another, and finally she told me she couldn't trust him, she had to keep everything under lock and key when she left the house; and when I was done with my work she wouldn't pay me 'till *Mr. Runge* was out of the house; she wouldn't let him see her give me any money, because she told me to wait until he was out of the house before she paid me."

All this evidence and more to the same effect was purely hearsay and inadmissible. *Topolewski v. State,* 130 Wis. 244, 109 N. W. 1037. It is said the trial court relied upon the case of *Hedger v. State,* 144 Wis. 279, 292, 128 N. W. 80, wherein it is said:

"The witnesses for the state were permitted to testify relative to the presence in the Hedger home of a bottle of chloroform labeled 'Chicago,' which was found there by Mrs. Hedger in the absence of the accused. The state attempted to prove what Mrs. Hedger said on finding the bottle, but this was erroneously ruled out on objection of the accused because not said in the presence of the accused."

The evidence referred to in the *Hedger Case* was held erroneously ruled out because Mrs. Hedger's statement upon finding the bottle was deemed to be a part of the *res gestæ* of that transaction—a spontaneous exclamation upon her part when finding a bottle of poison. It was not intended to hold that recitals of past transactions or statements of the deceased

as to her past or present relations with her husband, not made in his presence, were admissible. As before stated, the relations between them are properly a subject of proof—especially upon the question of motive, but they must be shown by competent evidence and not by hearsay.

The state argues that even if the evidence referred to was erroneously admitted it should not be held prejudicial since it was merely cumulative. It is true there was some competent testimony to the fact that their relations were unpleasant, but not very much; nor did such testimony disclose a very unusual condition. In view of the wholly circumstantial nature of the evidence against the accused; the meagerness of the competent evidence showing unpleasant relations; the volume and character of the evidence erroneously admitted; its direct bearing upon both claims of motive; and the fact that the trial court expressly charged that the evidence received as to the relations between the accused and his wife had an important bearing upon the question of motive, we are led to the conclusion that the error of admitting such hearsay evidence was prejudicial. The broad doctrine announced in *Topolewski v. State,* 130 Wis. 244, 249, 109 N. W. 1037, that the improper admission of hearsay evidence is presumed to be prejudicial unless the contrary clearly appears, to which we are referred by counsel for defendant, has been modified by sec. 3072m, Stats., providing that no judgment shall be reversed for any error relating to procedure unless in the opinion of the court, after an examination of the entire action, it shall appear that such error has affected a substantial right of the party seeking a reversal. In the present case it seems quite probable that the jury might have reached a different result had the incompetent evidence been excluded.

As bearing upon the question of motive the court was requested in writing by defendant's counsel to charge the jury as follows:

"Sec. 2180 of the Wisconsin Statutes provides that if the wife, at her death, shall leave issue by any former husband,

. . . such issue shall take the lands of which she died seised free and discharged from the right of the surviving husband. Mrs. Runge left her surviving two children by former husbands, and the defendant acquired no title to or interest in her real estate upon her death. You may take this into consideration in determining whether there was any motive for the defendant to commit the crime charged.

"The moneys arising from the insurance of Mrs. Runge's home, which was her homestead, are under the law exempt and considered a part of the realty, and the defendant acquired no title or interest in any portion of such insurance money. You may also take this fact into consideration in determining whether there was any motive for the defendant to commit the crime charged. Sub. 17, sec. 2982, Wisconsin Statutes [1898], page 2085."

The requested instruction was refused and none touching the subject was given by the court. This was error. Defendant was entitled to have the law as to his right to inherit his wife's property stated to the jury in order that they might properly weigh the evidence upon the question of motive.

The official stenographer of the coroner was properly permitted to use his short-hand notes upon the witness stand and to read from them. So, also, the court properly allowed the witness Boetcher to use his notes in testifying to statements made to him by the defendant. It was also proper for witnesses to testify as to the condition the deceased seemed to them to be in when in the presence of the defendant, as to being nervous or otherwise.

The remaining assignments of error are without merit and do not require discussion.

*By the Court.*—Judgment reversed, and action remanded for a new trial. The warden of the state prison will deliver the plaintiff in error into the custody of the sheriff of Milwaukee county, who will hold him in custody to await the further order of the court.