STATE, Respondent, v. DEAN, Appellant.*

*No. State 153. Argued December 2, 1974.—Decided April 10, 1975.*
(Also reported in 227 N. W. 2d 712.)

* Motion for rehearing denied, without costs, on June 30, 1975.

514

For the appellant there was a brief by *William M. Coffey* and *Dennis P. Coffey*, both of Milwaukee, and oral argument by *William M. Coffey*.

For the respondent the cause was argued by *David J. Becker*, assistant attorney general, with whom on the

brief was *Robert W. Warren,* attorney general, and *Lance B. Jones,* district attorney, Sheboygan county.

DAY, J. On November 12, 1971, following a jury trial in which he had been convicted of five counts of first-degree murder, a judgment of conviction was entered against Douglas Dean (defendant). He was sentenced to five consecutive life terms in the Wisconsin State Prison. His appeal from the judgment of conviction has previously been dismissed by this court as being untimely under order dated April 24, 1974. This appeal is from the order denying the defendant's motions for a new trial and from the order denying his motion for modification of sentence.

At approximately 12:15 p.m. on Monday, July 19, 1971, the pastor of St. George's Church found the defendant sitting on the back stairs of the church located in the town of Wilson, Sheboygan county, Wisconsin, approximately six miles from the city of Sheboygan. The pastor made inquiries of the defendant, but he was unresponsive and had a blank expression on his face. The pastor called the sheriff's department for assistance and a deputy sheriff responded and went to the church where he found the defendant sitting on the rear steps with his head down having difficulty breathing. An ambulance was called and the defendant was taken to St. Nicholas Hospital in Sheboygan. When asked if he had been in an accident, the defendant shook his head. He was admitted to the hospital at approximately 1 p.m. on July 19, 1971. His identity was determined from his wallet and attempts were made to contact his mother Mrs. Hildegarde Dean, with whom the defendant lived, at 1149 Cherry Lane, Sheboygan. When no response was received, the hospital personnel called the defendant's married sister who also lived in Sheboygan. She was informed that the defendant was in the hospital and of their inability to contact his

mother. She then proceeded to the mother's home where she arrived at approximately 2:20 p.m. and entered through an unlocked front door. She found her mother's body lying in bed in her bedroom in the southeast corner of the house and noticed a large amount of blood on and around her mother's head and on the pillow. The police were summoned and the first officer arrived at the scene at approximately 2:35 p.m. The officer went to the bedroom, observed Mrs. Dean's body with two gunshot wounds in the right side of her face. The door to the defendant's bedroom located across the hall was open. There were two beds in the room, neither of which appeared to have been slept in. On one of the beds, the officer observed an empty cardboard carton for a .22-caliber rifle and also an empty .22-cartridge box. After discovering her mother's body, the defendant's sister contacted the family attorney, advised him that her mother had been found dead and that her brother was in the hospital and incoherent; she asked him to go to the hospital to represent her brother. The attorney proceeded to the hospital and refused to permit the defendant to be questioned because of his condition. In the course of the investigation the police found that the defendant was a very close friend of one Ann Rammer and her family who lived about a block away from the Dean residence. Ann and the defendant had been going together for approximately two years and the defendant was known to have spent a lot of time at the Rammer home. Mrs. Rammer, a widow, lived with her children, John aged sixteen years, Paul aged eleven, Thomas aged ten, and Ann, who at the time was attending the University of Wisconsin in Madison. The police were unable to contact Mrs. Rammer and then contacted some of her relatives and met them at the home at approximately 8:10 p.m. on the evening of July 19, 1971. Officers from the Sheboygan police department entered the Rammer residence. Upon glancing

up the stairs, the police inspector saw the body of a small boy lying on the landing, covered with blood; the boy was Paul Rammer, who had been shot through the right eye and through the middle of the front of the neck. He then proceeded to the first-floor bedroom where he found the body of Mrs. Naomi Rammer lying in bed; she had also been shot in the head and neck. He then discovered a .22-caliber rifle lying on the floor in the living room. He proceeded upstairs past the body of Paul and discovered the body of Thomas Rammer, aged ten, lying in the hall; he had multiple gunshot wounds in his right arm, right chest, neck and face. He then entered another bedroom on the second floor and found the body of John Rammer, aged sixteen, who had been shot in the left arm, neck and head. Empty cartridge cases and cartridge cartons were found on the premises near the bodies.

On July 22, 1971, a complaint was issued charging the defendant with five counts of first-degree murder and he was placed under arrest in his hospital room in St. Nicholas Hospital. His trial began on November 1, 1971, and lasted for eight days. The family attorney did not represent the defendant at the trial. The defendant was represented by appointed counsel whose services had been requested by the defendant. This attorney was assisted by two other attorneys from his firm. The state was represented by the Sheboygan county district attorney and a special prosecutor appointed at the request of the district attorney.

Testimony adduced at the trial revealed that the defendant had graduated from a Sheboygan high school in June of 1970. Since then he had worked occasionally as a drummer in a local band but had not had any job for some period of time. In September of 1970, the defendant enrolled in the Lakeshore Technical Institute but dropped out of school in February of 1971. He was nineteen years of age and lived at home with his mother. In

addition to his sister, he had an older brother who was away at school at the time. The defendant's mother, who was widowed in May of 1970, was regularly employed at Wigwam Mills in Sheboygan. She did not drive and the defendant used to take her to work in her car. The testimony showed that the defendant's relationship with his mother had been deteriorating; they argued a lot and his mother threatened to have him committed. He told people that he hated his mother. He was in need of money and he had no sources of income and often argued with his mother about the social security money which he felt he was entitled to receive. A few days before the murders, he had returned to Sheboygan from a visit with Ann Rammer in Madison and stated he was going to ask his mother one more time for his social security money. He also participated in arguments between Ann Rammer and her mother concerning money for Ann's college expenses. He had a close relationship with the Rammer family. The testimony showed that Mrs. Rammer had paid his tuition to the Lakeshore Technical Institute. He was present during discussions of the Rammer family financial matters and was aware that the Rammer estate was worth about $100,000; he also knew that a trust fund set up for the Rammer children was to be distributed when the youngest child reached thirty and that his mother's estate was valued in excess of $40,000.

It was established at the trial that the rifle found in the living room of the Rammer home had been purchased by the defendant in May of 1970, and that the various cartridges strewn around the Rammer and Dean residences had been fired from that rifle. A classmate who attended the technical institute with the defendant testified that she had a friendly relationship with him and he used to confide in her. At one time he told her he wanted to set up a target range in the basement of his home so that he could shoot his mother when she came

down to the basement and then claim it was an accident. Another time he told her he had thought of a way to get a lot of money and said that some night when his mother was sleeping he would go into her room and shoot her and then go over to the Rammer home and shoot Mrs. Rammer. The defendant told the witness that his mother and Mrs. Rammer had a lot of money that would go either to him or to Ann Rammer if they should die and that though he said he would probably be caught he expected he would only be imprisoned for around ten years.

Testimony by a pathologist showed that death of all five victims had occurred between late on the 18th to early on the 19th of July and that four of the victims had died instantaneously and one within a few minutes of being shot. A next-door neighbor to the Rammers testified that at about 5 a.m. on July 19th he heard a loud cracking sound and other noise that sounded like a whizzing bullet. Another neighbor of the Rammers testified that at approximately 7:45 to 7:50 o'clock on the morning of July 19th she followed a car she identified as being the Rammer family station wagon for a distance of two blocks as she was coming to her home after taking her husband to work. The vehicle turned into the Rammer driveway as she drove on past. She said the car had only one occupant but she did not recognize who it was. Another neighbor testified that at approximately the same time she was in her yard doing yard work. Her house was immediately to the north of the Rammer home and she saw the defendant walk from the front of the Rammer home across her lawn, headed in a northerly direction toward his own home. She testified that the defendant crossed within 50 feet of her and was walking with his hands in his pockets, his head down, and walking very rapidly. She recognized him because she had seen him at the Rammer home almost daily.

A witness from the state crime laboratory testified that she had examined the clothes of the defendant which

he was wearing at the time he was taken to the hospital and she found no bloodstains on them. She microscopically examined his shoes and discovered on the sole of the right shoe minute quantities of human blood; she said it was not visible to the naked eye and that if all the spots she had found had been gathered together it would cover only an area about the size of a pin head.

The prosecution called a witness who had been an inmate in the county jail with the defendant while the defendant was awaiting trial. He said the defendant had talked to him about the murders and "He said something about some kid was crying and he shot him once and he wouldn't have shot him three or four times if he would have stopped yelling or crying . . ." He also testified the defendant said, "He was going from one house to another and then back again or something like that. . . ."

After the state rested, the defense put in its case which was based on a theory of a lack of sufficient evidence to find the defendant guilty beyond a reasonable doubt and that at the time of the commission of the offenses alleged the defendant was in such a drugged condition that he could not be held responsible for his acts under sec. 939.42 (1) and (2), Stats.[1]

The defendant presented testimony to establish that at the time he was picked up on the steps of the church he was in a stupefied and dazed condition. According to hospital personnel, when he was admitted his body was rigid and tense, his pupils dilated and fixed, his respiration was shallow. He was described as being completely disoriented, incoherent, irrational and starry-eyed. The

---

[1] "939.42 Intoxication. An intoxicated or a drugged condition of the actor is a defense only if such condition:

"(1) Is involuntarily produced and renders the actor incapable of distinguishing between right and wrong in regard to the alleged criminal act at the time the act is committed; or

"(2) Negatives the existence of a state of mind essential to the crime."

doctor who admitted the defendant testified that the blood test showed he had not ingested alcohol but in the doctor's opinion he had taken a hallucinogenic-type drug and his disorientation was due to such drug ingestion. The doctor also testified that in taking LSD (lysergic acid diethylamide) in normal dosage it usually lasted for five hours although sometimes the effects have lasted from ten to twelve hours. The doctor testified there is usually a gradual return to normality within eight hours of ingestion. At the time he was admitted to the hospital, the defendant had in his jacket pockets six pieces of candy of the gum-drop type; two were found to have inserted within them tablets of LSD. The examiner testified that one of the tablets found in one of the pieces of candy contained approximately 132 micrograms of that drug.

Defendant also testified in his own behalf. He stated he had returned from visiting Ann Rammer in Madison on July 16th and claimed that prior to leaving Madison he had been sitting in the student union reading a paper when a person he did not know came up and asked to see the paper and when he gave it to the stranger, the stranger asked him if he wanted a box of candy; he agreed and he gave him a box of the gumdrops which he stated he placed in his pocket and he did not know they contained any drug. He said that on July 18th he was at the Rammer home until about 11 p.m. when he went to his own home. He said he stretched out on his bed reading a chess book, took the box of gumdrops from his jacket pocket, ate about half of them and stated that within a half hour his ". . . thoughts started getting— like he was playing chess with someone . . . I got all mixed up . . . ." He said he began feeling tingly, his vision became impaired, that things seemed to move and to vibrate, that the colors were not normal. He remembered being somewhere he said was warm and dry, and was walking between two white lines which seemed

to stretch into infinity and the next he remembered he was talking to a friendly man and "a little monster near a steeple," which would have referred to the dog that accompanied the pastor of St. George's Church.

The defendant testified that prior to July 18, 1971, he had never used hard or hallucinogenic drugs. He admitted that he had smoked marijuana and hashish. He said he often simulated the use of LSD and hard drugs with other people but he had never taken them. On direct examination he said he had split LSD tablets in half with his friends and gave them a half and he took half but at the first opportunity when the friend would not be looking he would spit it out. He said he often told people things to shock them and as an example he described an incident in Madison with a female friend in which he said he appeared at her apartment and told her he was on an LSD trip and that a person could be violent on drugs; he wanted her to show fear or to get some emotion from her and told her he could stab her. He told her he was a violent person and that he had a girl friend two years ago who killed herself in his home; and then he said that to shock the friend, he told her that he was the one who had set it up, that he was the one who was responsible. He said that the statements he had made to the prosecution witness from the technical institute about setting up the target and shooting his mother were made with the same purpose in mind, i.e., to shock the listener.

He said he also told her that the year before his girl friend had killed herself in his home, he also simulated drug experiences to shock her. As to the story about planning to kill his mother, he said, "I saw her and I thought I would conjure up a story to shock her . . . I saw her in the hall and I talked to her and I said I had this great plan, I would kill my mother, I would kill Mrs. Rammer and that consequently, because of this I would probably go to jail for I said 10 or 11 years." He testified

that he thought if you went to jail for homicide you never got out. He also testified that his relationship with his mother was not good and that he had disagreements with her concerning the social security money and the car. He was asked by his attorney if he hated his mother and he said, "I don't think hate would be the word. I was frustrated with my mother, yes." He acknowledged that he had keys to the Rammer home and the Rammer automobile. On cross-examination he admitted that in March he had obtained 15 tablets of what had been identified to him as LSD; that he got them in Madison but he did not know from whom he obtained them; that he paid $1 a piece for them. He would share them with people that he knew and would pretend he took half of the pill and then would make references to colors, talk irrationally, speak about objects that were not there; he would say that he saw his father. One time he told a friend that he looked up and saw the girl who had killed herself in his home, she had committed suicide with his father's .22 rifle. He had told others that he had shown the girl where the gun and the ammunition were and that he had told people he had taught the girl how to use the gun.

In rebuttal the state produced testimony of a psychiatrist who had done studies with LSD. He testified the amount of LSD taken does not increase the duration of the effects or "trip." In response to a hypothetical question framed by the prosecutor, including the observation that the defendant's pupils were no longer dilated and fixed by 7:30 p.m. on Monday, July 19, 1971, the psychiatrist gave his opinion that the LSD had been ingested shortly before the defendant was discovered on the steps of St. George's Church.

On rebuttal the state produced the testimony of another jail inmate, who said the defendant told him that it was the first time he had ever killed anybody and then said, "Holy Christ, I hope nobody heard me say that." The

witness also testified that the defendant said that crime does pay if money is involved and that if a person is willing to spend part of his life in prison or time in prison for it. The defendant also questioned why Ann's brothers had to get in the way between him and Ann.

At the conclusion of the case, three possible verdicts were submitted to the jury: Guilty of first-degree murder; guilty of second-degree murder or not guilty. The jury returned guilty verdicts on all five counts of first-degree murder. Additional facts will be brought out in the discussion of the legal issues raised on this appeal.

This appeal is limited to the issues involved in the denial of the defendant's posttrial motions, the test to be applied in reviewing a trial court's order denying a new trial is whether there has been an abuse of discretion. *State v. Simmons* (1973), 57 Wis. 2d 285, 289, 203 N. W. 2d 887; and *State v. Wollmer* (1970), 46 Wis. 2d 334, 335, 336, 174 N. W. 2d 491. Where a question of law is presented, however, the test is whether the trial court was in error. *Jones v. State* (1974), 63 Wis. 2d 97, 216 N. W. 2d 224; and *State v. Mabra* (1974), 61 Wis. 2d 613, 213 N. W. 2d 545.

The first issue raised by the defendant is that the trial court should have ordered a change of venue on its own motion because of media publicity even though no motion for a change of venue was made by defense counsel, nor was any motion made to postpone the trial. This court has many times recognized that a trial court should act on its own motion when confronted with aggravated circumstances from which it appears that a jury's dispassionate evaluation of the evidence is rendered doubtful because of the pressure of publicity surrounding a case. *State v. Alfonsi* (1967), 33 Wis. 2d 469, 481, 147 N. W. 2d 550; *State v. Kramer* (1969), 45 Wis. 2d 20, 30, 171 N. W. 2d 919.

All the parties involved in this trial took steps to minimize the adverse effect of pretrial publicity that this case generated. The judge who issued the arrest warrant ordered the transcript of the hearing for the warrant sealed and made unavailable to the news media. The defendant's preliminary examination was closed to the public on motion of the defense counsel. The hearing on the defendant's motion to suppress evidence was closed to the public and press as well as all hearings at which evidentiary material was presented. In addition, the police and the prosecutor refused to divulge any of the facts to the press. The press reports which had been made part of the record on this appeal are free from details of incriminating evidence against the defendant. There was one isolated story on August 5, 1971, which revealed that the defendant had purchased the murder weapon in May of 1970; this fact was apparently made public at the arraignment when the defense counsel moved to dismiss the case, alleging an insufficient preliminary examination and arguing that the only evidence presented against the defendant at the preliminary hearing was the fact that he owned the murder weapon.

In addition to a change of venue or a continuance until publicity abates, an effective use of *voir dire* can identify and exclude prospective jurors who are in effect prejudiced. *Groppi v. Wisconsin* (1971), 400 U. S. 505, 510, 91 Sup. Ct. 490, 493, 27 L. Ed. 2d 571; *McKissick v. State* (1971), 49 Wis. 2d 537, 182 N. W. 2d 282. This case naturally produced a great deal of local publicity. However, it is the nature and the content of the publicity which must be considered. There were no editorials prejudicial to the defendant. The news stories were straight and factual and not incendiary. Compare *Sheppard v. Maxwell* (1966), 384 U. S. 333, 86 Sup. Ct. 1507, 16 L. Ed. 2d 600. We conclude there was no abuse of discretion in not ordering a change of venue sua sponte

nor in denying the defense motion to *voir dire* jurors individually outside the presence of other jurors.

The jury panel in this case was drawn up after the clerk of court sent out questionnaires to 200 prospective jurors. On the basis of the response as to these questionnaires, 103 people were excused from the panel for various reasons including health, occupational hardship, personal hardship and other reasons. Twenty-one were excused because they had formed opinions as to the guilt or innocence of the defendant. The remaining 97 prospective jurors were ordered to appear for possible jury duty. From this group of 97, 68 were called and subjected to *voir dire* before the jury of 12 with two alternates was finally picked. The trial court prior to questioning the panel gave the standard jury instruction on the presumption of innocence and reasonable doubt. The court conducted the initial questioning of the 68 prospective jurors; eight were excused for various reasons unrelated to any preconceived beliefs as to the defendant's guilt or innocence. Only one on the panel had not heard or read about the case. Those who had were asked whether they had formed an opinion in this case and whether it would take some evidence to overcome this opinion. They were cautioned not to reveal what their opinion was and 26 were excused because they admitted they had formed an opinion and that it would take some evidence to overcome their opinion. There is no evidence that the jury panel in this case was at all reluctant to state whether or not they had a preconceived notion of the defendant's guilt or innocence; at least 26 answered the question freely and candidly admitted that they had formed an opinion. There was no restriction on the extent of defense counsel's questioning of the jurors on *voir dire* and there was no exposure of the jurors to any adverse publicity about the case during the trial. None who admitted a preconceived opinion became a member of the final jury panel. We are satisfied that the *voir dire* of the jury

panel adequately protected the defendant's rights. *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120.

Defendant makes the argument that the trial court improperly excused all prospective jurors who indicated they had an opinion as to the defendant's guilt or innocence and who said that it would take some evidence to overcome their opinion. The defendant argues that the trial court before dismissing such jurors should first determine what that opinion was and if the opinion was the defendant was innocent, that is the type of juror who should have been retained. We disagree. The right of a defendant is to an impartial jury, not one which has prejudged the case in his favor. The right is to have a jury that will consider the defendant innocent until they are satisfied beyond a reasonable doubt of his guilt. As the United States Supreme Court said in *Irvin v. Dowd* (1961), 366 U. S. 717, 722, 81 Sup. Ct. 1639, 6 L. Ed. 2d 751:

" . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. . . . In the language of Lord Coke, a juror must be a 'indifferent as he stands unsworne'. His verdict must be based upon the evidence developed at the trial. The theory of the law is that a juror who has formed an opinion cannot be 'impartial.' "

The defendant next alleges that he was denied a fair trial because of what he alleges was the systematic exclusion of "all self-employed persons from service on the jury without inquiring into their qualifications, ability or willingness to serve as jurors." The record does not support this allegation. The questionnaires sent to the jurors provided a place where the prospective jurors could indicate if there was any reason why they could not serve as jurors. Several who were self-employed responded that it would be an undue hardship on them and their business, if they were to serve. It was these people who were excluded. The self-employed person had to request

that he be excused before he was in fact excused; thus there was no systematic exclusion of all self-employed individuals. Several who were self-employed and who did not ask were not excused. This was borne out by the questionnaires filled out by prospective jurors who were in fact self-employed. At least five prospective jurors who were self-employed were called and questioned at the *voir dire*. At least one individual who was an insurance agent and thus presumably self-employed sat on the jury. One other who was a self-employed hobby-shop owner was struck by the defendant as an alternate juror. Of the five self-employed individuals who made it to the *voir dire* stage, three indicated they were self-employed on their questionnaires. Assuming that the self-employed are in fact a "class," the record fails to support the allegation of automatic exclusion of this group.

The defendant makes the argument that he was denied a public trial because the press and the public were excluded from the preliminary hearing and the evidentiary hearings on his motion to suppress evidence. The motion to exclude the press and the public was made by the defendant's lawyer. He argues that the record does not show that he individually agreed to the exclusion of the press and the public; therefore he was denied the right to a public trial. He cites no authority in support of this argument. The granting of the defendant's motion to exclude the press and the public was obviously done with a view to protecting the rights of the defendant prior to trial. What the trial court did here was in complete conformity to the American Bar Association *Standards Relating to Fair Trial and Free Press* (approved draft, 1968). Sec. 3.1, p. 113, of those guidelines provides, in part:

"In any preliminary hearing, bail hearing, or other pretrial hearing in a criminal case, including a motion to suppress evidence, the defendant may move that all or part of the hearing be held in chambers or otherwise

closed to the public on the ground that dissemination of evidence or argument adduced at the hearing may disclose matters that will be inadmissible in evidence at the trial and is therefore likely to interfere with his right to a fair trial by an impartial jury. The motion shall be granted unless the presiding officer determines that there is no substantial likelihood of such interference. . . ."

The defendant does not claim that he opposed the exclusion of the press and the public; his only claim is that he did not consent to it. We regard this as one of those instances where the defense counsel had the right to make the decision. *State v. Harper* (1973), 57 Wis. 2d 543, 205 N. W. 2d 1.

The defendant contends the trial court erred in permitting a friend of the decedent, Mrs. Dean, to relay conversations she had with Mrs. Dean outside of the defendant's presence. The witness testified that she had gone on a short vacation with Mrs. Dean to Door county on July 4, 1971; that she had had conversations with Mrs. Dean a number of times concerning Mrs. Dean's relationship with her son the defendant. The defense counsel's objections to the testimony were overruled and the witness was permitted to testify that Mrs. Dean had told her that the defendant did not cooperate with her; that he had the impression after he quit school that all he had to do was to sit home and have his mother take care of him; that he refused to do anything around the house to help her; that he had the run of the car which she had purchased but would not take her anywhere she wanted to go; that he thought he had a certain amount of money coming without working for it and that she had to support him until he was twenty-one; that he did not want her to spend money on anything else and that he gave as his reason that there would be more money after she was gone and that if she ever died he would have her cremated because it would be less expensive. The state on this appeal argues that, while this is hearsay, it is an

exception which permits testimony regarding statements showing the state of mind or emotion of the declarant, citing McCormick, *Evidence* (2d ed.), p. 694, sec. 294, and the state also makes the contention that it is an exception recognized by "modern analysts" which permits testimony regarding statements by an unavailable declarant relating to events which the declarant person observed. The state also cites Wisconsin Rules of Evidence, sec. 908.045 (2).[2] The state also quotes the trial court's comment on motions after verdict:

"This testimony was not offered to prove the truth of what deceased told the witness, but rather the mental and emotional state of the deceased in her relationship with her son as established by what she said."

We disagree.

The testimony was clearly inadmissible hearsay and should have been excluded. The reference to McCormick on Evidence is not in point; it refers to declarations of present mental or emotional state to show a state of mind or emotion in issue.

No explanation is given by the state as to why Mrs. Dean's state of mind in July of 1971 had any materiality in the prosecution of her son for murder. The reference to the Wisconsin Rules of Evidence is misplaced since the change, if applicable, did not take place until January 1, 1974. This testimony was put in the state's case in chief and could have no materiality. No case authority was

---

[2] "908.045 Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: . . .

"(2) STATEMENT OF RECENT PERCEPTION. A statement, not in response to the instigation of a person engaged in investigating, litigating, or settling a claim which narrates, describes, or explains an event or condition recently perceived by the declarant, made in good faith, not in contemplation of pending or anticipated litigation in which he was interested, and while his recollection was clear. . . ."

cited either by the court or by the state in justification of the admission of this hearsay testimony. The case directly in point is the case of *Runge v. State* (1915), 160 Wis. 8, 150 N. W. 977, in which this court granted a new trial for a man convicted of the murder of his wife because the state's witnesses were allowed, over objection, to relate various conversations they had had with the deceased to the effect that she was afraid of her husband; that she wanted to divorce her husband; that they were always quarreling because of her property and that the defendant was mean and cross; that she did not trust her husband and kept everything under lock and key. While this testimony of the poor relation between the defendant and his mother and the defendant's desire for money was improperly admitted through the testimony of this witness, it was merely cumulative to evidence that was ultimately presented by the prosecution which covered the same points. We conclude that because of other evidence offered in the trial that the receipt of this testimony constituted harmless error. As this court said in *Wold v. State* (1973), 57 Wis. 2d 344, 356, 204 N. W. 2d 482:

"The test of harmless error is not whether some harm has resulted, but, rather, whether the appellate court in its independent determination can conclude there is sufficient evidence, other than and uninfluenced by the inadmissible evidence, which would convict the defendant beyond a reasonable doubt."

Because we conclude the record had such evidence, we also conclude the trial court did not abuse its discretion in refusing to grant a new trial on this ground.

The defendant next alleges that it was error for the trial court to permit witnesses to testify as to what was depicted in photographs taken of the victims after having ruled that the photographs themselves were inadmissible

because of the gruesome scenes which they depicted, particularly the wounds of the decedents.

The court admonished those viewing the photographs at the witness stand and testifying as to their contents not to permit the photographs to be seen by the jury. We regard this admonishment as proper. There is no question that the police officers' testimony as to what they saw at the crime scenes was admissible and it was certainly proper for them to describe the condition of the victims and where the bullet wounds were. The photographs were an aid to testimonial accuracy. There is no argument that the photographs or the testimony with respect thereto did not accurately depict the scene or the victims. We conclude that there was no error in permitting the witnesses to describe the contents of the photographs.

Defendant alleges at least two instances of improper cross-examination of the defendant in violation of the American Bar Association Standards for Criminal Justice, *The Prosecution Functions and The Defense Function* (approved draft, 1971), sec. 5.7 (d), p. 122, and sec. 7.6 (d), p. 270, which provide:

"It is unprofessional conduct to ask a question which implies the existence of a factual predicate which the examiner cannot support by evidence,"

and in violation of the Wisconsin's Code of Professional Responsibility, Disciplinary Rules, which provides in DR7–106, (C) (1):

"(C) In appearing in his professional capacity before a tribunal, a lawyer shall not:

"(1)   State or allude to any matter that he has no reasonable basis to believe is relevant to the case or that will not be supported by admissible evidence." 43 Wis. 2d lxiii (1969).

In one instance the defendant was being cross-examined about his conversation with the friend from the vocational school referred to above with regard to the amount of time one would spend in prison before being eligible for parole in a homicide case, telling her that it would be ten years. The defendant admitted the conversation but denied that he really thought that and stated that he thought that there was no parole in such a case. The prosecutor then said: "You had a book at home entitled, 'Criminal Investigation' didn't you?" to which the defendant answered, "Not that I know of," and when asked if the book had ever been seen by the defendant in his bedroom, he said "No." The state never did put in any proof that such a book was ever found. The second incident involved cross-examining the defendant about the alleged purchase of an hallucinogenic drug at a local department store, which the defendant denied. In the first instance, there was never any follow up by the state as to finding such a book or what it said with respect to eligibility for parole. The defendant alleges that the effect of the question was to imply that the defendant did have such knowledge. There was no objection by the defense counsel to the questions about the book or the drug purchase.

In the absence of an objection, this court has said it will not review allegedly improper conduct. *State v. Bailey* (1972), 54 Wis. 2d 679, 691, 196 N. W. 2d 664; *Wilson v. State* (1973), 59 Wis. 2d 269, 295, 208 N. W. 2d 134.

However, Wisconsin case law clearly supports the proposition enunciated by the American Bar Association standards cited and the Wisconsin Code of Professional Responsibility. *State v. Richter* (1939), 232 Wis. 142, 286 N. W. 533; *State v. DeHart* (1943), 242 Wis. 562, 8 N. W. 2d 360.

In both instances the prosecutor should have produced the evidence and in the case of the book have been

prepared to show its materiality. We cannot hold, however, that the failure to produce a book, "Criminal Investigation," was so prejudicial as to warrant the granting of a new trial. In the case of failure to establish the hallucinogenic drug purchase at a local department store, the defendant's testimony of having purchased hallucinogenic drugs, having given them to his friends and other evidence in the trial as to the defendant's drug involvement could hardly make the absence of proof of one more alleged drug purchase so prejudicial as to warrant a new trial.

During cross-examination of the defendant, the prosecutor asked him if he had not refused to talk to the doctors in the hospital without the presence of his attorney. He also elicited from the defendant that he had had an attorney representing him since the afternoon of Monday, July 19th. The examining doctor in response to questions stated that he obtained a medical history from the defendant after the defendant had retained and talked to attorneys. When the defendant's sister testified, she was asked about having retained an attorney for her brother and was asked, "Why did you think he needed an attorney?"

All of this line of questioning was improper. *See: Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974; *Scales v. State* (1974), 64 Wis. 2d 485, 219 N. W. 2d 286. In *Scales,* as in the case before us, the defendant was in the hospital and not in actual custody.

In an attempt to uphold the propriety of this type of questioning, the state cites several cases which involved a situation where the accused took the witness stand and made assertions that were either inconsistent with prior statements made or were inconsistent with the accused's prior silence. The assertions made at those trials were the type that normally would have been stated either in

mitigation or in an assertion of innocence at the time of the arrest. These cases are concerned with permitting a fabricated defense to be foisted on a jury without the state being able to show that it was probably fabricated. *Harris v. New York* (1971), 401 U. S. 222, 91 Sup. Ct. 643, 28 L. Ed. 2d 1; *United States v. Ramirez* (5th Cir. 1971), 441 Fed. 2d 950; *People v. Calhoun* (1971), 33 Mich. App. 141, 189 N. W. 2d 743; *People v. Queen* (1972), 8 Ill. App. 3d 858, 290 N. E. 2d 631.

In the case before us, the defendant in taking the stand did not assert anything that was remotely impeachable by the questions propounded by the prosecution. The questions by the prosecutor were improper. *Galloway v. State* (1966), 32 Wis. 2d 414, 425, 425a, 145 N. W. 2d 761, 147 N. W. 2d 542; *State v. Spring* (1970), 48 Wis. 2d 333, 338, 179 N. W. 2d 841; *State v. Tew* (1972), 54 Wis. 2d 361, 363, 195 N. W. 2d 615; *Buckner v. State* (1972), 56 Wis. 2d 539, 548, 549, 202 N. W. 2d 406; *State v. Johnson* (1973), 60 Wis. 2d 334, 342, 344, 210 N. W. 2d 735.

Even though defense counsel did not object to this line of questioning at the trial, the state admits in its brief that this is properly raised on appeal because it is of constitutional dimension. The state nevertheless claims that there was a "strategic waiver" by the defense counsel and that it was part of the trial strategy to permit this line of questioning. We find nothing in the record that indicates that there was any "strategic waiver" and we find therefore that the issue is properly raised here on appeal *State v. Johnson, supra.* However, the sister's responses to this improper line of questioning sufficiently negated the inference that she asked the family attorney to go to her brother because she thought he had killed her mother. The improper questioning of the defendant was mitigated by the fact it was clear he had not requested the attorney himself—it was the family

lawyer sent by his sister and he merely did what the attorney told him to do. In view of the totality of the other evidence that was properly admitted and received, the error committed in permitting this type of questioning by the prosecution must be regarded as harmless beyond a reasonable doubt. *State v. Spring, supra.*

The defendant assigns as one of the grounds for reversal the taking of the defendant's clothing at the hospital on the 19th of July and the placing of that clothing in the desk of the hospital superintendent where they were kept until a search warrant was issued the next day and they were then seized under the search warrant. Pursuant to a motion to suppress the evidence, a hearing was held before the Hon. CHARLES L. LARSON, county judge of Ozaukee county, presiding, on October 14, 1971. The court denied the defendant's motion to suppress. On July 19th while the defendant was in the hospital, the family attorney who had been retained by his sister came to the hospital with one of his associates and while he was in the hospital room two detectives from the police department also appeared. There was a conversation between the attorney and one of the detectives about moving the defendant out of the room where there was another patient and moving him to a single room. Arrangements were made and he was in fact moved. During the course of this moving, the defendant's clothing which was hanging in a closet with the clothing of the other patient occupying the room was inquired about by one of the detectives and in the course of moving the defendant out, the detective along with a nurse removed the defendant's clothing from the room after ascertaining from the other patient and the nurse which clothing belonged to the defendant. The clothing was taken to the nurses' station on the floor; it was placed in separate plastic bags and then all of it placed in one large bag. The family attorney, when he saw what was

occurring, testified at the hearing on the motion to suppress that he stated, "Fellows, I don't think I would remove his clothing at the present time." He stated that the detective replied that the defendant was a suspect and that the clothing was being held as evidence. The detective testified that he had said it was being held for safekeeping. It is quite clear that the nurse in assisting in the gathering and bagging of the clothing and the tagging of the clothing and in seeing to it that it was placed in a locked drawer in the superintendent's desk was acting on instructions of the detective. The next day, some thirty hours later, a search warrant was obtained and the clothing was then seized from the hospital pursuant to the warrant and was later turned over to the state crime laboratory. The challenge is on the basis that there was no search warrant at the time that the property was taken by the detective and the nurse and that the defendant was not under arrest. The judge in his decision dated October 21, 1974, stated:

"It is the Court's conclusion that removal of the clothing from the hospital room to another room in St. Nicholas Hospital were it was placed in a locked desk drawer was not a seizure and did not adversely affect the defendant. Whether the clothing had remained in the closet within room 218, in a closet in room 202, or in Sister Augusta's office until lawfully seized is not relevant. . . . While in the office of Sister Augusta it was not in possession of nor under the control of the police. Except with the issuance of a valid search warrant they would not have been able to remove the articles of clothing from the hospital."

The court concluded that the items were not "seized" and denied the motion.

The scope of our review on an order denying a motion to suppress evidence has been stated by this court in the case of *State v. Pires* (1972), 55 Wis. 2d 597, 603, 201 N. W. 2d 153. This court said:

". . . we have held that when a trial court has made detailed findings of fact in connection with a confession, review of evidentiary or historical physical facts will be limited to the same review used in other factual disputes heard and determined by a trial judge. The findings of the trial court will not be upset unless they are against the great weight and clear preponderance of the evidence. *State v. Carter* (1966), 33 Wis. 2d 80, 90, 91, 146 N. W. 2d 466.

"On appeal, the same standards apply for review of an order suppressing evidence."

From a review of the record we cannot say that the conclusions of the trial court are against the great weight and clear preponderance of the evidence. We therefore find it was not an abuse of discretion for the trial court to deny a motion for a new trial on this issue.

Counsel for the defendant in his brief alleges that the evidence is insufficient to support findings of guilt beyond a reasonable doubt on each of the counts of murder in the first degree.

This court has many times stated the test to be applied in this court on appeal when the question is the sufficiency of evidence in a criminal case. The test is not whether this court is convinced beyond a reasonable doubt of the defendant's guilt but whether this court can conclude that the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in part or in whole upon circumstantial evidence. The credibility of the witnesses and the weight of evidence are for the trier of fact. We must view the evidence in the light most favorable to the conviction. *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725. We are satisfied that from the evidence adduced at the trial the jury, as the trier of fact, could find the defendant guilty of all five counts of first-degree murder beyond any reasonable doubt. Therefore we conclude the trial

court did not abuse its discretion in denying the motion for a new trial on the ground of the sufficiency of the evidence.

Counsel for the defendant maintains that the imposition by the trial court of five consecutive life sentences constituted cruel and unusual punishment in violation of the constitution and was an abuse of discretion on the part of the trial court.

The first issue raised by the defendant that the sentence offends the constitution has recently been disposed of adversely to the contention of the defendant by the United States Supreme Court in the case of *Schick v. Reed* (1974), 419 U. S. 256, 95 Sup. Ct. 379, 42 L. Ed. 2d 430. In *Schick,* the President of the United States had commuted the death sentence of a soldier for the murder of an eight-year-old girl to imprisonment at hard labor for the term of his natural life on condition that the defendant Schick " '. . . shall never have any rights, privileges, claims, or benefits arising under the parole and suspension or remission of sentence laws of the United States.' " The supreme court in the majority opinion stated, at p. 267:

"The no-parole condition attached to the commutation of his death sentence is similar to sanctions imposed by legislatures such as mandatory minimum sentences or statutes otherwise precluding parole; it does not offend the constitution."

The next question is whether or not the trial judge abused his discretion in denying the motion for reduction of sentence. Following conviction of the defendant, the trial court imposed five life sentences to run consecutively rather than to have some or all of them run concurrently. One of the tests of abuse of discretion as to whether or not it was exercised at all, did the judge give a rationale as to the reason for the sentences? At the time of the imposition of sentences the trial judge stated:

"Therefore, you are appearing here today as a sane person who has been convicted of intentionally killing your mother while she was asleep in her bed by shooting her in the head at close range, by intentionally killing your girl friend's mother while she, too, apparently was asleep in bed, and then killing her three sons, two of whom at least were also in their beds and one while trying to flee. You shot all of the victims in their heads, each being shot fatally, causing almost instant death for each one of them. There is absolutely nothing, as the District Attorney has stated, to mitigate your acts, whether or not you had consumed any drugs before the killings. Under the law you must be penalized for each intentional killing. The penalty provided for each crime of first-degree murder is life imprisonment. I am satisfied that you are a dangerous person. Society must be protected from you for as long as the law permits."

In the trial judge's decision on the motion to reduce the sentences dated January 22, 1973, Judge BUCHEN said:

"It seems to be the position of Dr. Karl Menninger and Dr. Seymour Halleck, both noted psychiatrists and authorities in the field of criminology that rehabilitation is or at least should be the only goal of punishment. This certainly is the theme of Dr. Menninger's book entitled 'The Crime of Punishment.'

"However, we still recognize the need to isolate dangerous persons. For the reasons I set forth at the time of sentencing I found that the defendant was and is a dangerous person. Dr. Halleck personally interviewed the defendant, but nowhere in his letter does he find or give an opinion that the defendant is not a dangerous person. . . .

"I am fully aware of what is stated in 'The Law of Criminal Corrections,' by Sol Rubin, p. 355, 'Experience in many systems shows uniformly that persons convicted of murder are good risks on parole, better than other offenders. It is extremely rare for a murderer on parole to commit another homicide.' This is true because most murders are committed because of hatred for or fear of the victim and the perpetrator has no reason to kill again.

However, I believe that this is one of the 'extremely rare' cases in which society must be protected from the defendant now and in the future.

"The magnitude of five separate killings of two women and three children required the maximum penalty permitted by law."

The record is clear that the judge did in fact exercise his discretion. *McCleary v. State* (1971), 49 Wis. 2d 263, 182 N. W. 2d 512.

The penalty for first-degree murder is set forth in sec. 940.01, Stats.[3] A person sentenced to life imprisonment is eligible for parole after twenty years, less time earned for good conduct.[4] Sec. 973.15 of the statutes at the time the defendant was convicted provided that sentences could be imposed consecutively.[5]

In *People v. Holman* (1945), 72 Cal. App. 2d 75, 100, 164 Pac. 2d 297, 311, the court of appeals reversed a trial court's imposition of 22 consecutive life sentences in a case involving the arson of an apartment hotel in which 22 people died. The appellant in that case contended that only one life sentence could be imposed. The California appeals court said:

"Sec. 190, Penal Code, prescribes that 'Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the jury . . .' and in our opinion such express provision brings this situation squarely within the proviso of

---

[3] "940.01 **First-degree murder.** (1) Whoever causes the death of another human being with intent to kill that person or another shall be sentenced to life imprisonment."

[4] "57.06 **Paroles from state prisons and house of correction.** (1) (a) The department may parole an inmate of the Wisconsin state prisons . . . when he has served 20 years of a life term, less the deduction earned for good conduct as provided in s. 53.11. . . ."

[5] "973.15 **Sentence, terms, escapes.** (1) . . . The court may impose as many sentences as there are convictions and may provide that any such sentence be concurrent or that it shall commence at the expiration of any other sentence; . . ."

section 669, Penal Code (as amended in 1943) that 'if the punishment for any of said crimes is *expressly prescribed* to be life imprisonment, whether with or without possibility of parole, then the terms of imprisonment on the other convictions, whether prior or subsequent, shall be merged and run concurrently with such life term.' (Emphasis added.) Accordingly, we agree with the appellant's contention on this point."

Wisconsin has no such provision, and while the legislature has seen fit over the years to reduce the time in which one sentenced to life for first-degree murder is eligible for parole, the legislature has not seen fit either to require that all sentences merge into a life sentence or to establish a parole eligibility in the case of multiple life sentences. When the parole statute was first adopted in 1907, ch. 110, Laws of 1907, there was no provision for parole eligibility for one serving a life term. By ch. 182, Laws of 1909, the legislature changed that law and provided that one could be eligible for parole who is serving a life sentence after thirty years, less good time. By ch. 313, Laws of 1943, the legislature further reduced it to the present twenty years. This would certainly show a legislative intent over the years to reduce the amount of time one sentenced to a life term spends in prison before being eligible for parole and would, of course, apply to those sentenced to more than one life term to be served concurrently.

This court has held that more than one life sentence may be imposed. In the case of *Simecek v. State* (1943), 243 Wis. 439, 10 N. W. 2d 161, a twenty-one-year-old man had been convicted of the first-degree murder of a young woman and her three children. The defendant was sentenced to life imprisonment for each of the four counts; the terms to run concurrently. This court stated, at page 449:

"Counsel also contends that it was error to sentence the defendant on each one of the four counts. This was proper."

The judge in passing sentence considered the aggravated nature of the crimes as evincing a high degree of culpability on the defendant's part and the need for the protection of the public. These are relevant in making a sentence determination. *State v. Schilz* (1971), 50 Wis. 2d 395, 402, 184 N. W. 2d 134; *Bastian v. State* (1972), 54 Wis. 2d 240, 247, 194 N. W. 2d 687.

We cannot say that the trial judge abused his discretion in denying the motion to reduce the sentence on a postconviction motion for such reduction.

*By the Court.*—Orders affirmed.