STATE of Wisconsin,
Plaintiff-Appellant-Cross-Respondent,

v.

Matthew J. KNAPP,
Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 2000AP2590–CR. Oral argument February 16, 2005.
—Decided July 14, 2005.*

2005 WI 127

(Also reported in 700 N.W.2d 899.)

For the plaintiff-appellant-cross-respondent the cause was argued by *William L. Gansner*, assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager*, attorney general.

For the defendant-respondent-cross-appellant there was a brief by *Robert G. LeBell*, Milwaukee, and oral argument by *Robert G. LeBell*.

¶ 1. LOUIS B. BUTLER, JR., J. This case is on remand from the United States Supreme Court,[1] which vacated our decision in *State v. Knapp*, 2003 WI 121,

---

[1] *Wisconsin v. Knapp*, 542 U.S. 952, 124 S. Ct. 2932 (Wis. Jun. 30, 2004) (No. 03–590).

265 Wis. 2d 278, 666 N.W. 2d 881 (*Knapp I*). In *Knapp I*, this court concluded that physical evidence obtained as the direct result of a *Miranda*[2] violation is inadmissible when the violation was an intentional attempt to prevent the suspect from exercising Fifth Amendment rights. *Id.*, ¶ 78. In light of *United States v. Patane,* 542 U.S. 630, 124 S. Ct. 2620 (2004), in which a plurality of the Court concluded that the fruit of the poisonous tree doctrine does not extend to derivative evidence discovered as a result of a defendant's voluntary statements obtained without *Miranda* warnings, the United States Supreme Court vacated and remanded our decision for further consideration.

¶ 2. We conclude that the fruit of the poisonous tree doctrine applies under the circumstances of this case under Article I, Section 8 of the Wisconsin Constitution. Where physical evidence is obtained as the direct result of an intentional *Miranda* violation, we conclude that our constitution requires that the evidence must be suppressed. Therefore, we reverse the circuit court's order.[3]

I

¶ 3. The following facts remain undisputed for purposes of this appeal. In the early morning hours of December 12, 1987, Resa Scobie Brunner (Resa) was

---

[2] *Miranda v. Arizona,* 384 U.S. 436 (1966).

[3] Our decision rests on bona fide separate, adequate, and independent state grounds. *See Michigan v. Long,* 463 U.S. 1032, 1040 (1983).

Further, we reinstate all portions of our decision in *State v. Knapp,* 2003 WI 121, 265 Wis. 2d 278, 666 N.W. 2d 881, not implicated by the Supreme Court's order vacating our decision in light of *United States v. Patane,* 542 U.S. 630, 124 S. Ct. 2620 (2004).

murdered in her home in Watertown, Wisconsin. On the afternoon of December 12, around 2 p.m., her husband, Ervin J. Brunner (Brunner), found Resa's body lying in their bedroom, beaten to death with a baseball bat.

¶ 4. An autopsy conducted the next day established Resa's time of death as between 2:15 and 4:30 a.m. Brunner claimed that he had been with another woman, Sharon Maas (Maas), the evening of December 11 and had slept at his parents' house in Clyman, Wisconsin, that night. Brunner told police that he and Maas were in a bar in Sullivan, Wisconsin, until 2 a.m., and then they drove directly to his parents' house without stopping in Watertown.

¶ 5. The police investigation revealed that on the night of Resa's murder, Knapp and Resa were seen drinking together in a Watertown bar and then eating together in a Watertown restaurant after the bar closed. When they were leaving the restaurant, although they got up to leave at the same time, Knapp left first, as Resa had to go back to pay her check.

¶ 6. On December 12, the police confirmed that Knapp was on parole, with a condition being that he not consume alcohol. When Knapp's parole officer learned that Knapp had been drinking, he ordered an apprehension request and requested that the police arrest Knapp.

¶ 7. On December 13, Detective Timothy Roets (Roets) of the Watertown Police Department went to Knapp's apartment to arrest him on the apprehension request. When Roets arrived at the inner-door to Knapp's apartment, he saw Knapp through the door's window and told Knapp to open the door because he had a warrant for Knapp's arrest on a parole violation. Knapp picked up a phone to call his attorney. Knapp eventually hung up the phone, stepped back, let Roets

in, and told Roets he was trying to call his attorney. Roets told Knapp that he had to go to the police station, but Roets never read Knapp the *Miranda* warnings.

¶ 8. Before leaving for the police station, Knapp and Roets went to Knapp's bedroom so Knapp could put on some shoes. While in the bedroom, Roets questioned Knapp about the clothes Knapp had been wearing the prior evening, and Knapp pointed to a pile of clothing on the floor. Roets seized the clothes and took Knapp to the police station.

¶ 9. In that pile of clothing was a blue sweatshirt. The sweatshirt contained human blood on one of the arm cuffs and near the top of the zipper. An analysis conducted in 1988 determined that Resa could not be eliminated as the source of the blood.

¶ 10. After Roets arrested Knapp and transported him to the police station, Roets questioned Knapp further but still did not give him *Miranda* warnings. Roets told Knapp that it was his responsibility to advise everybody of their constitutional rights that may have had contact with Resa just prior to her death. At that point, Knapp stated he did not want to write or sign any statements, as he had been previously told by an attorney not to speak to police. Roets still did not give the *Miranda* warnings, however. In response to questioning, Knapp told Roets about his whereabouts from the prior evening, including his encounter with Resa at a bar and how after the bar closed Resa talked him into getting something to eat. While walking to the restaurant, Knapp stated that he witnessed Resa get into a fight with another woman, from which Resa got a bloody nose. Knapp said that he helped her wipe away the blood by using the sleeve of his sweatshirt. When it occurred to Knapp that he was not being questioned as a witness but rather as a suspect, he again said he

would not write or sign a statement without a lawyer. At that point, Roets took Knapp to a holding cell.

¶ 11. Given the little evidence the State had linking Knapp to the crime, 12 years passed before the State charged him for Resa's death. In the meantime, in addition to investigating Knapp's involvement, the police investigated others. Knapp asserts that a likely suspect of Resa's murder is her husband, Brunner. Prior to the time of the murder, Resa and Brunner had been married for only six months, and they told various witnesses that they were having marital problems. The night of Resa's murder, Brunner slept with Maas. The week before the murder, Brunner found Resa sitting with another man in his truck, dragged Resa out of the truck, and told police officers he would "knock her out" if he ever caught Resa cheating on him again. Additionally, Brunner told his stepdaughter the night of the murder that he and Resa were fighting. Earlier that evening Resa called her daughter and told her to go to their home and take the key off of the porch. Brunner admitted he might not have had a key to his home that evening. During a fight with a girlfriend a few years later, Brunner stated that he wished he "had a bat." Brunner also stated during a polygraph examination that he killed his wife.

¶ 12. Sometime in 1998, the Department of Justice's Division of Criminal Investigation (DCI) began investigating the case, and in the summer of 1999 it located new witnesses who implicated Knapp in Resa's murder. Knapp's ex-girlfriend, Sandra Huebner, stated that in 1995 Knapp battered her and said, "I'll do to you what I did to her." Also, Pedro Blas-Jasso told an investigator that Knapp confessed to him ten to 15 times that he killed Resa. Most significantly, while the 1988 analysis of Knapp's sweatshirt indicated that Resa

could not be excluded as the source of the blood, recent forensic DNA tests established that the blood was Resa's.

¶ 13. On November 12, 1999, the State charged Knapp with first-degree intentional homicide for Resa's death. Knapp filed a motion to suppress, among other things, the sweatshirt that contained Resa's blood, making several arguments for its exclusion. Regarding the grounds involving the illegal fruit of a *Miranda* violation, the following exchange between the State and Roets occurred:

[State]: In talking with him at the—in the office, I mean, you knew that he was in custody, right?

[Roets]: Yes, I did.

[State]: And you knew that, in order to interview him effectively in custody, you needed to *Mirandize* him, correct?

[Roets]: Yes, sir.

[State]: You knew you hadn't been able to do that, right?

[Roets]: That's correct.

[State]: But you continued to talk to him.

[Roets]: Yes, sir.

[State]: You were seeking information.

[Roets]: Yes, I was.

[State]: Were you trying to keep the lines of communication open?

[Roets]: Yes.

¶ 14. On cross-examination, Knapp emphasized that Roets had not even given him *Miranda* warnings at the apartment through the following exchange:

[Counsel for Knapp]: It was your conclusion in the apartment that [Knapp] was really trying to call his attorney. You can't dispute that, right?

[Roets]: Oh, yeah, he was trying to call his attorney.

[Counsel for Knapp]: And you, as [the State] characterized it, wanted to [] "keep the lines of communication open," so you did not respond in that—say to him, "I am going to give you your rights now," right?

[Roets]: That's right.

[Counsel for Knapp]: You abandoned the notion of reading him his constitutional rights based on what he told you relative to wanting an attorney, right?

[Roets]: That's accurate, yes.

[Counsel for Knapp]: And you wanted to keep the lines of communication open and you were concerned, were you not, that if you had *Mirandized* him at that point that he might not make a statement, right?

[Roets]: That's accurate.

. . . .

[Counsel for Knapp]: Okay. Well, you didn't, again, read him his rights, and were concerned that he would exercise his rights based on what he told you about wanting an attorney present because you told him— you never told him he was a suspect; you told him you just want his help?

[Roets]: I told him that yes, sir.

¶ 15. The Jefferson County Circuit Court, Honorable Randy R. Koschnick, denied the suppression motion. Knapp appealed.

¶ 16. This court accepted the court of appeals' certification to determine whether physical evidence obtained as the direct result of a *Miranda* violation should be suppressed when the violation was an intentional attempt to prevent the suspect from exercising his Fifth Amendment rights. This court answered the question in the affirmative. *Knapp I,* 265 Wis. 2d 278, ¶ 1.

¶ 17. On October 20, 2003, the State filed a writ of certiorari in the United States Supreme Court. On June 28, 2004, the Court rendered its decision in *Patane.* Two days later, on June 30, the Court granted the State's petition, vacated our decision, and remanded the case for further consideration in light of *Patane.*

¶ 18. On September 24, 2004, we directed the parties to submit briefs to address the effect of *Patane,* including alternate grounds for suppressing the sweatshirt that were not reached in *Knapp I.*[4]

II

¶ 19. Our standard of review has not changed. "Whether evidence should be suppressed is a question of constitutional fact. In reviewing questions of constitutional fact, we uphold a circuit court's factual findings unless clearly erroneous, but we independently deter-

---

[4] The alternate arguments Knapp raised for suppressing the sweatshirt are whether there was a knock-and-announce violation or a violation of *Edwards v. Arizona,* 451 U.S. 477 (1981). *See State v. Knapp,* 2003 WI 121, ¶¶ 118, 121, 265 Wis. 2d 278, 666 N.W.2d 881 *(Knapp I).* Because we conclude the evidence is inadmissible under Article I, Section 8 of the Wisconsin Constitution, we do not address these alternate grounds for suppression.

mine whether those facts meet the constitutional standard." *State v. Samuel,* 2002 WI 34, ¶ 15, 252 Wis. 2d 26, 643 N.W.2d 423 (citations omitted).

¶ 20. There are no historical facts in dispute, as the State has conceded that the physical evidence was seized as a direct result of an intentional *Miranda* violation. Therefore, all that remains is a question of law: whether the physical evidence should be suppressed under either the United States or Wisconsin Constitutions.

## III

¶ 21. We begin with some brief observations regarding the exclusionary rule, followed by a discussion of *Patane,* where a three-Justice plurality of the Supreme Court, in an opinion authored by Justice Thomas and joined by Chief Justice Rehnquist and Justice Scalia, concluded that the "fruit of the poisonous tree" doctrine does not apply to suppress nontestimonial evidence obtained from a voluntary statement that stemmed from a failure to give the prophylactic *Miranda* warnings. From there, we discuss *Missouri v. Seibert,* 542 U.S. 600, 124 S. Ct. 2601 (2004), released on the same day as *Patane,* but where a different plurality of the court, in an opinion authored by Justice Souter and joined by Justices Stevens, Ginsburg, and Breyer, concluded that a police practice of intentionally failing to give *Miranda* warnings until a suspect confessed could not effectively comply with *Miranda*'s constitutional requirement.

## A

¶ 22. The exclusionary rule is premised on suppressing evidence that "is *in some sense* the product of

illegal governmental activity." *Nix v. Williams,* 467 U.S. 431, 444 (1984) (emphasis in original). This court has similarly characterized the exclusionary rule, stating: "Evidence obtained as a direct result of a violation of a constitutional right . . . is inadmissible upon proper objection." *State v. Loeffler,* 60 Wis. 2d 556, 561, 211 N.W.2d 1 (1973). The primary purpose of the exclusionary rule "is to deter future unlawful police conduct. . . ." *United States v. Calandra,* 414 U.S. 338, 347 (1974).[5] However, "to the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the 'substantial social costs exacted by the exclusionary rule.'" *Illinois v. Krull,* 480 U.S. 340, 352–53 (1987) (quoting *United States v. Leon,* 468 U.S. 897, 907 (1984)).

---

[5] For this reason, the Supreme Court in *Arizona v. Evans,* 514 U.S. 1, 14–16 (1995), concluded that the exclusionary rule did not apply to evidence obtained from an arrest that was premised on an arrest warrant that should have been quashed from computer records and would have been quashed but for a clerical error by court employees. The Court determined that there was nothing to deter by suppressing evidence obtained as a result of a court personnel's clerical error. The Court stated, "Because court clerks are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime, they have no stake in the outcome of particular criminal prosecutions." *Id.* at 15. In addition, "If it were indeed a court clerk who was responsible for the erroneous entry on the police computer, application of the exclusionary rule . . . could not be expected to alter the behavior of the arresting officer." *Id.* Because "[t]here is no indication that the arresting officer was not acting objectively reasonably when he relied upon the police computer record," the Court held that there was "a categorical exception to the exclusionary rule for clerical errors of court employees." *Id.* at 15–16.

¶ 23. Although rooted in the Constitution, "[t]he exclusionary rule is a judge-made one in furtherance of conduct that courts have considered to be in the public interest and to suppress conduct that is not." *Conrad v. State*, 63 Wis. 2d 616, 636, 218 N.W.2d 252 (1974). It has also been said that the exclusionary rule applies only in contexts "where its remedial objectives are thought most efficaciously served." *Pennsylvania Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363 (1998) (citation and quotations omitted). Thus, the exclusionary rule is not absolute, but rather is connected to the public interest, which requires a balancing of the relevant interests. *State v. Eason*, 2001 WI 98, ¶ 43, 245 Wis. 2d 206, 629 N.W.2d 625.

¶ 24. The exclusionary rule applies to both tangible and intangible evidence and also excludes derivative evidence under certain circumstances, via the fruit of the poisonous tree doctrine, if such evidence is obtained "by exploitation of that illegality." *Wong Sun v. United States*, 371 U.S. 471, 485–88 (1963); *State v. Schneidewind*, 47 Wis. 2d 110, 118, 176 N.W.2d 303 (1970). "[I]n its broadest sense, the [fruit of the poisonous tree doctrine] can be regarded . . . as a device to prohibit the use of any secondary evidence which is the product of or which owes its discovery to illegal government activity." *State v. Schlise*, 86 Wis. 2d 26, 45, 271 N.W.2d 619 (1978).

¶ 25. Although the fruit of the poisonous tree sprouted from the Fourth Amendment, its application is not so confined. The fruit of the poisonous tree doctrine has been applied to the Fifth and Sixth Amendments, *see Nix*, 467 U.S. at 442, as well as statutory violations.

¶ 26. Regarding Fifth Amendment applications, in *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion), the Supreme Court noted that "our cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial." (Emphasis in original.)

¶ 27. In *United States v. Hubbell*, 530 U.S. 27, 45 (2000), which concerned the compelled production of documents, the Supreme Court concluded that "[i]t has . . . long been settled that [the Fifth Amendment's] protection encompasses compelled statements that lead to the discovery of incriminating evidence even though the statements themselves are not incriminating and are not introduced into evidence." *Id.* at 37. Thus, the privilege protects against "use of incriminating information derived directly or indirectly from the compelled testimony . . . ." *Id.* at 38.

¶ 28. In *Harrison v. United States*, 392 U.S. 219, 220 (1968), the defendant testified after the government admitted into evidence three illegally obtained confessions. The Supreme Court concluded the defendant was impelled to testify, and that the testimony therefore was the fruit of a poisonous tree. The Supreme Court stated:

> [T]he petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby— the fruit of the poisonous tree, to invoke a time-worn metaphor.

*Id.* at 222.

¶ 29. In the Sixth Amendment context, in *United States v. Wade,* 388 U.S. 218, 237 (1967), the Supreme Court held that the absence of counsel at a post-indictment lineup violated a defendant's Sixth Amendment right to counsel. The Court held that a subsequent in-court identification may warrant suppression unless the State can show the identification had an independent origin, or its admission was otherwise harmless. *Id.* at 240–42.

¶ 30. Moreover, in *Nix,* 467 U.S. at 449–50, the Supreme Court held that a victim's body found after police gave the infamous "Christian burial speech," that violated the defendant's Sixth Amendment right to counsel, was lawfully admitted because it would have been inevitably discovered.

¶ 31. Aside from constitutional violations, the fruit of the poisonous tree doctrine has also been applied to statutory violations. In *Nardone v. United States,* 308 U.S. 338, (1939), the Supreme Court held that facts illegally obtained from a wiretap under the Communications Act could not be used at trial. However, the Court delineated a fruit of the poisonous tree framework that allowed the government to otherwise use the information obtained from the illegal wiretaps. The Court stated:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.

*Id.* at 341.

¶ 32. In *Patane,* a plurality of the Supreme Court declined to extend these principles to physical evidence obtained from a *Miranda* violation. We now turn to that decision.

## B

¶ 33. In *Patane,* police officers were investigating whether Patane, a convicted felon, violated a temporary restraining order that prohibited him from contacting his ex-girlfriend. During that investigation, the police were also informed that Patane illegally possessed a firearm. The police went to Patane's residence and, after inquiring into Patane's attempts to contact his ex-girlfriend, the police arrested him for violating the restraining order.

¶ 34. The police attempted to read Patane his *Miranda* rights, but Patane interrupted after the police advised him of his right to remain silent, stating that he already knew his rights. The police never completed the *Miranda* warnings and proceeded to ask Patane about the gun he possessed. While Patane was initially reluctant to answer, he later admitted that the gun was in his bedroom. He gave the police permission to retrieve the gun and the police seized it.

¶ 35. A grand jury later indicted Patane for possession of a firearm by a convicted felon. He moved to suppress the gun and the district court granted the motion, concluding that the police lacked probable cause to arrest Patane for violating the restraining order. The Tenth Circuit Court of Appeals reversed that conclusion, but nevertheless concluded that the gun should be suppressed because it concluded the gun was the fruit of an unwarned statement. In light of the

Court's holding in *Dickerson v. United States,* 530 U.S. 428 (2000), that *Miranda* established a constitutional rule, the court of appeals reasoned that a violation of *Miranda* amounted to a violation of the Constitution, specifically the Fifth Amendment. Thus, the court of appeals applied the fruit of the poisonous tree doctrine pronounced in *Wong Sun,* 371 U.S. 471, and upheld the district court's suppression of the gun. The Supreme Court reversed.

¶ 36. The plurality began with a discussion of the Self-Incrimination Clause. Noting that it need not draw the precise boundaries of the clause's protections, the plurality concluded that it sufficed to say "the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *Patane,* 124 S. Ct. at 2626. Indeed, the plurality determined the text of the Self-Incrimination Clause was "self-executing" to this end, meaning that its language that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself" was its own exclusionary rule of sorts. *Id.* at 2628 (quoting U.S. Const. amend. V). With the limited focus on the actual right against compelled incrimination—that is, compelled incriminating testimonial statements extracted at trial from the defendant—the plurality determined that "[t]he Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *Id.* at 2626. The plurality later conceded, however, that the same did not hold true for nontestimonial fruits obtained from an actually compelled statement. *Id.* at 2627–28 (citing *New Jersey v. Portash,* 440 U.S. 450, 458–49 (1979)).

¶ 37. The plurality recognized that the Court previously crafted "prophylactic rules," which were de-

102

signed to safeguard the core protections of the Self-Incrimination Clause outside the confines of an actual trial. The creation of these judge-made rules stemmed from " '[t]he natural concern . . . that an inability to protect the right at one stage of a proceeding may make its invocation useless at a later stage.' " *Id.* at 2627 (quoting *Michigan v. Tucker,* 417 U.S. 433, 440–41 (1974)). Despite that natural concern, the plurality stated that these prophylactic rules (which included *Miranda*) necessarily stepped beyond the actual protections of the Self-Incrimination Clause. *Id.* Thus, adhering to the principle that there must be the closest possible fit between the Self-Incrimination Clause and any prophylactic rule designed to protect it, the plurality concluded that "any further extension of these rules must be justified by its necessity for the protection of the actual right against compelled self-incrimination." *Id.* at 2627–28. With this groundwork, the plurality turned to *Miranda.*

¶ 38. The plurality agreed that for certain uses, *Miranda* created a presumption of coercion where a suspect does not receive the *Miranda* warnings. *Id.* at 2627, 2630. However, the plurality wrote that pre-*Dickerson* cases clearly established that a mere failure to give *Miranda* warnings did not, of itself, violate an individual's constitutional rights, or even the *Miranda* rule for that matter. *Id.* at 2628. Since *Miranda* sought to protect the Self-Incrimination Clause, and since the Self-Incrimination Clause was a trial right with a core protection of safeguarding compelled incriminatory testimonial statements, the plurality reasoned that a *Miranda* violation does not occur until unwarned statements are admitted into evidence at trial.[6] *Id.* at 2629.

---

[6] This is true regardless of whether there was a negligent or even calculated failure to provide the suspect with the full

"[J]ust as the Self-Incrimination Clause primarily focuses on the criminal trial, so too does the *Miranda* rule." *Id.* at 2626. With *Miranda*'s focus on the admissibility of statements at trial, the appropriate and adequate remedy for a *Miranda* violation, the plurality concluded, was suppression of the statement. *Id.* at 2629.

¶ 39. That *Dickerson* held that *Miranda* was a "constitutional rule" did not alter this analysis, the plurality stated. *Id.* at 2629. The plurality viewed *Dickerson* as merely a reaffirmation of *Miranda*'s " 'core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.' " *Id.* at 2628 (quoting *Dickerson,* 530 U.S. at 443–44). As *Dickerson* did not (and presumably could not) extricate the *Miranda* prophylaxis from the Self-Incrimination Clause's protection of trial rights, the plurality determined that *Dickerson* "makes clear our continued focus on the protections of the Self-Incrimination Clause." *Id.*

¶ 40. With this understanding, the plurality returned to the need to maintain a "close-fit" between the Self-Incrimination Clause's protection of trial rights and any extension of the prophylactic judge-made rules designed to safeguard those protections. The plurality found no fit whatsoever where the admission of nontestimonial fruit of a voluntary statement is concerned, as "[t]he admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.* at 2630. Without that risk, the plurality concluded that mere or even calculated failures to provide *Miranda* warnings did not warrant suppression of any subsequent fruit. *Id.* at 2629–30. And because the police cannot even

panoply of warnings prescribed by *Miranda,* provided the statement was not actually coerced. *Patane v. United States,* 542 U.S. 630, 124 S. Ct. 2620, 2629 (2004).

violate a defendant's trial right against self-incrimination by taking an unwarned voluntary statement, the plurality concluded that expansion of the exclusionary rule could not be justified by reference to "a deterrence effect on law enforcement." *Id.* at 2630. Thus, the plurality found no need to extend the fruit of the poisonous tree doctrine to *Miranda* violations. *Id.*

¶ 41. Justices Kennedy and O'Conner concurred in the judgment, agreeing with the plurality that "[a]dmission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an accused's coerced incriminating statements against himself." *Id.* at 2631. However, while the concurrence viewed it as doubtful that the exclusion of reliable physical evidence could be justified by a deterrence of law enforcement rationale, the concurrence stated that it was "unnecessary to decide whether the [police's] failure to give Patane the full *Miranda* warnings should be characterized as a violation of the *Miranda* rule itself, or whether there is 'anything to deter' so long as the unwarned statements are not later introduced at trial." *Id.* at 2631.

¶ 42. In a separate dissent, Justice Breyer stated that he would exclude physical evidence obtained from unwarned questioning "unless the failure to provide *Miranda* warnings was in good faith." *Id.* at 2632. Because the district court did not make any finding in this regard, Justice Breyer indicated he would remand the case to make such a determination. *Id.* at 2632–33.

¶ 43. Justice Souter, joined by Justices Stevens and Ginsburg, dissented. Resting on "the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it," this dissent noted that *Miranda* created a presumption of coercion where a custodial confession is not preceded by warn-

ings. *Id.* at 2631. Because the Fifth Amendment privilege against compelled self-incrimination extends to the exclusion of derivative evidence, "[t]hat should be the end of this case." *Id.* at 2632 (citing *United States v. Hubbell,* 530 U.S. 27, 37–38 (2000)). This dissent lamented: "In closing their eyes to the consequences of giving an evidentiary advantage to those who ignore *Miranda,* the majority adds an important inducement for interrogators to ignore the rule in that case." *Id.* at 2631. According to the dissent, "[t]here is no way to read this case except as an unjustifiable invitation to law enforcement officers to flout *Miranda* when there may be physical evidence to be gained." *Id.* at 2632. The dissent also called the plurality's decision an "odd one, coming from the Court on the same day it decides *Missouri v. Seibert,* [124 S. Ct. 2601 (2004)]." *Patane,* 124 S. Ct. at 2632.

## C

¶ 44. In *Seibert,* police arrested the defendant as a suspect in an arson that resulted in a death. At the police station, the police followed protocol whereby they intentionally refrained from reading the defendant the *Miranda* warnings and proceeded to interrogate her for 30–40 minutes to obtain a confession. After the defendant confessed, the police gave her a 20–30 minute break. The police then returned, turned on a tape recorder, gave the defendant the *Miranda* warnings, obtained a waiver of rights, and then repeated the prior interrogation to obtain the same confession. At a later suppression hearing, the police officer admitted that he made a conscious decision to withhold *Miranda* warnings because he resorted to an interrogation technique he was taught: "question first, then give the warnings,

and then repeat the question 'until I get the answer that she's already provided once.' " *Seibert,* 124 S. Ct. at 2606.

¶ 45. The trial court suppressed the defendant's first statement, but not the second. The Missouri Court of Appeals affirmed, but the Missouri Supreme Court reversed, concluding the police officer's tactic was to intentionally deprive the defendant of her opportunity to knowingly and intelligently waive her *Miranda* rights. *Id.* at 2606. Because there were no circumstances that would dispel the effect of the intentional *Miranda* violation, the Missouri Supreme Court concluded the second confession was involuntary and therefore inadmissible. The United States Supreme Court affirmed.

¶ 46. The plurality in *Seibert* began by discussing the concept of voluntariness. The plurality explained that in *Miranda,* the Court determined that the " 'voluntariness doctrine in the state cases . . . encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' " *Id.* at 2607 (quoting *Miranda,* 384 U.S. at 464–65). Because " 'the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements,' " *id.* at 2607–08 (quoting *Dickerson,* 530 U.S. at 435), the plurality described *Miranda* as an appreciation of the difficulty of judicial enquiry into the circumstances of a police interrogation. *Id.* at 2607.

¶ 47. To implement and safeguard the Self-Incrimination Clause, *Miranda* concluded that " 'the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.' " *Id.* at 2608 (quoting *Miranda,* 384 U.S. at 467). Thus, giving the warnings and obtaining a valid

107

waiver "has generally produced a virtual ticket of admissibility." *Id.* Recognizing that "[t]here are those, of course, who preferred the old way of doing things, giving no warnings and litigating the voluntariness of any statement in nearly every instance," *id.* at 2608, the plurality noted that *Miranda*'s "constitutional character" was recently reaffirmed by *Dickerson,* wherein the Court held that Congress could not thwart *Miranda* by statute. *Id.*

¶ 48. With these principles in mind, the plurality then focused on whether the intentional two-tiered interrogation scheme designed as an end-run around *Miranda* effectively complied with *Miranda*'s objectives of ensuring confessions were voluntary. *Id.* at 2610. The plurality concluded it did not.

¶ 49. The plurality held that "[b]y any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.* at 2610. The plurality surmised that "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Id.* at 2611. Thus, the plurality concluded, "when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and 'depriv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " *Id.* (quoting *Moran v. Burbine,* 475 U.S. 412, 424 (1986)).

¶ 50. The plurality was not persuaded by Missouri's argument that the defendant's second confession was obtained as the result of nothing more than a "second stage" interrogation that was distinct from the first. *See Oregon v. Elstad,* 470 U.S. 298 (1985). Unlike in *Elstad,* where there was a "good-faith *Miranda* mistake" at the defendant's home followed by an interrogation at the police station, *Seibert,* 124 S. Ct. at 2612, the plurality concluded that the circumstances under consideration were at the opposite extreme:

> In *Elstad,* it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.
>
> At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything [the defendant] said could be used against her also applied to the details of the inculpatory statement previously elicited. . . . These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a

109

reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.* at 2612.

¶ 51. In closing, the plurality pronounced that "[s]trategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson* held Congress could not do by statute." *Id.* at 2613. Therefore, "[b]ecause the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, [the defendant's] postwarning statements are inadmissible." *Id.* at 2613.

¶ 52. Justice Breyer concurred for the same reasons set forth in his *Patane* concurrence. *Id.* at 2613–14

¶ 53. Justice Kennedy broke from the *Patane* plurality and concurred in *Seibert.* Justice Kennedy agreed that the interrogation technique used was designed to circumvent *Miranda* and obscured *Miranda*'s meaning. *Id.* at 2614. He emphasized that not all violations of *Miranda* require suppression. "Evidence is admissible when the central concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction." *Id.* The police tactic at issue in *Seibert* clearly undermined Miranda's meaning and effect, Justice Kennedy wrote, as it "simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of 'knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.' " *Id.* at 2615 (quoting *Moran,* 475 U.S. at 423–24). Thus, "postwarning statements that

are related to the substance of prewarning statements must be excluded absent specific, curative steps." *Id.* However, he reiterated that absent deliberate strategies to get around *Miranda, Elstad* represented the proper test. *Id.* at 2616.

¶ 54. Justice O'Connor dissented, joined by Chief Justice Rehnquist and Justices Scalia and Thomas. The dissent stated it would analyze the two-step interrogation tactic under *Elstad. Id.* at 2619.[7]

## IV

¶ 55. The State argues that this court should affirm the circuit court's order that denied suppression of Knapp's bloodied sweatshirt for two reasons. First, the State contends that *Patane* clearly holds that nei-

---

[7] *Missouri v. Seibert,* 124 S. Ct. 2601 (2004), focused on *Miranda*'s concern of ensuring statements are voluntary. In the present case, when the police knocked on Knapp's door to arrest him, Knapp picked up a telephone to call his attorney. Officer Roets understood that Knapp was trying to get a hold of his attorney, but Roets nonetheless asked Knapp what he was wearing the night of Resa's murder. Further, while Knapp was at the police station with Roets, Knapp stated he did not want to make or sign a statement without a lawyer. Nevertheless, Roets continued his interrogation.

The voluntariness of all of Knapp's statements from these interrogations is suspect, as Knapp attempted to invoke his right to counsel. *See Edwards,* 451 U.S. 477; *State v. Jennings,* 2002 WI 44, 252 Wis. 2d 228, 647 N.W.2d 142. Moreover, this is not a situation where, as in *Patane,* Knapp declined to receive *Miranda* warnings that were being given by the police. *See Patane,* 124 S. Ct. at 2625. Like *Seibert,* this case involves a situation that reveals a police strategy adapted to undermine the *Miranda* warnings. *Seibert,* 124 S. Ct. at 2612. Nevertheless, we do not address this issue as we conclude that physical fruits obtained from an intentional *Miranda* violation are not admissible under Article I, Section 8 of the Wisconsin Constitution.

ther the Fifth Amendment nor *Miranda* require suppression of physical evidence derived from a voluntary statement given without *Miranda* warnings. The State submits *Patane* is dispositive here because Knapp neither raised violations of, nor did this court base its prior decision on, our state constitution's analogue to the Fifth Amendment, Wis. Const. art. I § 8.[8] Second, the State claims that it would be inappropriate to stray beyond the confines of the Fifth Amendment given *State v. Jennings*, 2002 WI 44, ¶¶ 40–42, 252 Wis. 2d 228, 647 N.W.2d 142, where this court declined to interpret Wisconsin's self-incrimination protection more broadly than the Fifth Amendment.

¶ 56. Knapp argues that *Patane* notwithstanding, this court should utilize Article I, Section 8 of the Wisconsin Constitution to arrive at the same conclusion as in *Knapp I*. Although he concedes that he did not explicitly make this argument before and that *Knapp I* predominantly relied on Fifth Amendment jurisprudence, Knapp argues that the issue is fully before the court now and that the interests of justice require its consideration. *See Bradley v. State*, 36 Wis. 2d 345, 359–59a, 153 N.W.2d 38, 155 N.W.2d 564 (1967) ("[T]his court may nevertheless decide a constitutional question not raised below if it appears in the interests of justice to do so and where there are no factual issues that need resolution."). Knapp proceeds to argue that the policy reasons this court identified and relied on in *Knapp I* remain, notwithstanding *Patane*. We agree with Knapp.

---

[8] Article I, section 8 of the Wisconsin Constitution states in pertinent part:

> (1) No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself.

112

## A

¶ 57. It is plain that United States Supreme Court interpretations of the United States Constitution do not bind the individual state's power to mold higher standards under their respective state constitutions. *See Cooper v. California,* 386 U.S. 58, 62 (1967). Indeed, the United States Supreme Court, through both majority and dissenting opinions, has explicitly extended invitations to the states to adopt different rules should they deem it appropriate. *See Iowa v. Tovar,* 541 U.S. 77, 94 (2004) ("We note, finally, that States are free to adopt by statute, rule, or decision any guides to the acceptance of an uncounseled plea they deem useful."); *Nichols v. United States,* 511 U.S. 738, 748 n.12 (1994) ("Of course States may decide, based on their own constitutions or public policy, that counsel should be available for all indigent defendants charged with misdemeanors."); *Oregon v. Mathiason,* 429 U.S. 492, 499 (1977) ("It is therefore important to note that the state courts remain free, in interpreting state constitutions, to guard against the evil clearly identified by this case.") (Marshall, J., dissenting); *Baxter v. Palmigiano,* 425 U.S. 308, 339 n.10 (1976) ("[U]se of incriminating statements can be prohibited by a state court as a matter of public policy in that State.") (Brennan, J., dissenting); *Michigan v. Mosley,* 423 U.S. 96, 120–121 (1975) (Brennan, J., dissenting); *Oregon v. Hass,* 420 U.S. 714, 719 (1975) ("[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.") (emphasis in original); *Lego v. Twomey,* 404 U.S. 477, 489 (1972) ("Of course, the States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at

stake."); *Cooper,* 386 U.S. at 62 ("Our holding, of course, does not affect the State's power to impose higher standards on searches and seizures than required by the Federal Constitution if it chooses to do so."). Correspondingly, this court has stated that when interpreting our constitution, decisions from the United States Supreme Court interpreting analogous provisions in the federal constitution "are eminent and highly persuasive, but not controlling, authority." *McCauley v. Tropic of Cancer,* 20 Wis. 2d 134, 139, 121 N.W.2d 545 (1963).

¶ 58. In spite of this, the State correctly observes that this court in *Jennings* stated that " '[w]here . . . the language of the provision in the state constitution is 'virtually identical' to that of the federal provision or where no difference in intent is discernible, Wisconsin courts have *normally construed* the state constitution consistent with the United States Supreme Court's construction of the federal constitution.' " *Jennings,* 252 Wis. 2d 228, ¶ 39 (quoting *State v. Agnello,* 226 Wis. 2d 164, 180–81, 593 N.W.2d 427 (1999)) (emphasis added). In *Jennings,* because this court concluded that "[t]he state constitutional right against compulsory self-incrimination is textually almost identical to its federal counterpart,"[9] this court declined to impose a clarification requirement under Article I, Section 8 of the Wisconsin Constitution when a suspect equivocally invokes the right to counsel. *Id.,* ¶¶ 40, 42. The State submits that the same analysis should apply here.

---

[9] The Fifth Amendment to the United States Constitution provides in relevant part:

> No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law.

¶ 59. This "lock-step" theory of interpreting the Wisconsin Constitution no broader than its federal counterpart appears to be aimed at promoting uniformity in the law. Uniformity may be advantageous, but it cannot be indispensable. "[I]t is the prerogative of the State of Wisconsin to afford greater protection to the liberties of persons within its boundaries under the Wisconsin Constitution than is mandated by the United States Supreme Court . . . . " *State v. Doe,* 78 Wis. 2d 161, 171, 254 N.W.2d 210 (1977). As *Doe* cogently stated, this court "will not be bound by the minimums which are imposed by the Supreme Court of the United States if it is the judgment of this court that the Constitution of Wisconsin and the laws of this state require that greater protection of citizens' liberties ought to be afforded." *Id.,* at 172.

¶ 60. We begin with a comparison of the text of the constitutions. While textual similarity or identity is important when determining when to depart from federal constitutional jurisprudence, it cannot be conclusive, lest this court forfeit its power to interpret its own constitution to the federal judiciary. The people of this state shaped our constitution, and it is our solemn responsibility to interpret it. *See Attorney Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567, [*567, 786 [*757] (1855). Federal jurisprudence is persuasive and helpful, but we must save independent judgment for considering competing principles and policies under the Wisconsin Constitution.

¶ 61. Our recent decision in *State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582, fits this framework. In that case, based in part on the extensive research on the inaccuracy of eyewitness identifications, this court relied on the Due Process Clause of the

115

Wisconsin Constitution to conclude that showup identifications are inadmissible unless, based on the totality of the circumstances, otherwise necessary. *Id.,* ¶¶ 29–34. Thus, we departed from the current federal law that centered on the reliability as opposed to the necessity of the showup. *Id.* In response to the State's argument that this court had never interpreted the Due Process Clause of the Wisconsin Constitution any differently than the corresponding federal provision, we held that "[e]ven though the Due Process Clause of Article I, Section 8 of the Wisconsin Constitution uses language that is somewhat similar, but not identical, to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, we retain the right to interpret our constitution to provide greater protections than its federal counterpart." *Id.,* ¶ 41. We explained:

> While this results in a divergence of meaning between words which are the same in both federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is greater protection of individual rights under state law than under federal law. . . .

*Id.* (quoting William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489, 500 (1977)).

¶ 62. As noted, the *Jennings* court determined that Article I, Section 8 of the Wisconsin Constitution is virtually identical to its federal counterpart, the Fifth Amendment to the United States Constitution. Consistent with the framework above, this weighs in favor of following *Patane* and *Seibert* under our constitution, but it is not determinative. We now add other consid-

erations to the balance, including the applicability of Wisconsin's exclusionary rule.

B

¶ 63. Shortly after Wisconsin earned statehood, this court declared: "By the policy of the law, no person is compelled to give evidence against himself, or to testify to any matter tending to criminate himself." *Schoeffler v. State,* 3 Wis. 717 [*823], 733, [*841] (1854). Indeed, this court has recognized that because the rights protected by Article I, section 8 are "sacred," we construe this provision liberally, "in favor of private rights." *State v. Kroening,* 274 Wis. 266, 275, 79 N.W.2d 810, 80 N.W.2d 816 (1956). The *Kroening* court recognized the "unanimous concurrence of opinion" that the rights intended to be protected by Article I, Section 8 "are so sacred, and the pressure so great toward their relaxation in case where suspicion of guilt is strong and evidence obscure, that it is the duty of the courts to liberally construe the prohibition in favor of private rights." *Id.* (citations omitted). The *Kroening* court reminded that courts must be vigilant "to refuse to permit those first and doubtful steps which may invade [Article I, Section 8] in any respect." *Id.* (citation omitted).

¶ 64. Consistent with these principles, this court has described Article I, Section 8 as "extend[ing] not only to testimony which would support a conviction but also to evidence which would furnish a link in a chain of evidence necessary to prosecution." *Grant v. State,* 83 Wis. 77, 81, 264 N.W.2d 587 (1978).

¶ 65. Also consistent with these principles, in 1923, in what has been described as a "watershed in Wisconsin law," *State v. Orta,* 2000 WI 4, ¶ 7, 231 Wis.

117

2d 782, 604 N.W.2d 543 (Prosser, J., concurring), this court first recognized the exclusionary rule in *Hoyer v. State,* 180 Wis. 407, 193 N.W. 89 (1923), nearly 40 years prior to its incorporation into the Fourteenth Amendment in *Mapp v. Ohio,* 367 U.S. 643 (1961). And this court did so by fusing Article I, Sections 8 and 11 (the complement to the Fourth Amendment).

## C

¶ 66. In *Hoyer,* police unlawfully searched the defendant's vehicle and seized bottles of gin. *Hoyer,* 180 Wis. at 409. Because this was during the time of Prohibition, the defendant was charged with unlawfully transporting intoxicating liquors. *Id.* at 407. The defendant moved to suppress the evidence, relying on Article I, Sections 8 and 11 of the Wisconsin Constitution.[10]

¶ 67. This court "elect[ed] to stand, as this court has heretofore stood, with the federal and other courts which consider these provisions of the Bill of Rights as embodied in constitutions to be of *substance rather than mere tinsel.*" *Id.* at 415 (emphasis added). To the *Hoyer* court, the choice was obvious:

> We see no reason in logic, justice, or in that innate sense of fair play which lies at the foundation of such

---

[10] Article I, Section 8 of the Wisconsin Constitution provided: "No person ... may be compelled in any criminal case to be a witness against himself."

Article I, Section 11 of the Wisconsin Constitution provided:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

▬▬▬▬▬▬▬

guarantees, why a court of justice, rejecting as abhorrent the idea of the use of evidence extorted by violation of a defendant's right to be secure in person and exempt from self-incrimination though it may result in murder going unwhipt of justice, should yet approve of the use, in the same court of justice, by state officers, of that which has been obtained by other state officers through, and by, a plain violation of constitutional guarantees of equal standing and value, though thereby possibly a violation of the prohibition law may go unpunished.

*Id.* at 417.

¶ 68. Turning to the specific guarantees of Article I, Sections 8 and 11, the court expounded on their purposes:

[Article I, Section 11] is a pledge of the faith of the state government that the people of the state, all alike (with no express or possible mental reservation that it is for the good and innocent only), shall be *secure* in their persons, houses, papers, and effects against unreasonable search and seizure. This security has vanished and the pledge is violated by the state that guarantees it when officers of the state, acting under color of state-given authority, search and seize unlawfully. The pledge of this provision and that of [Article I, Section 8] are each violated when use is made of such evidence in one of its own courts by other of its officers.

*Id.* at 417 (emphasis in original).

¶ 69. Although the court recognized the consequences that a guilty person may go free if evidence is suppressed, the court did not falter:

That a proper result—that is, a conviction of one really guilty of an offense—may be thus reached is neither an excuse for nor a condonation of the use by the state of that which is so the result of its own violation of its own

119

fundamental charter. Such a cynical indifference to the state's obligations should not be judicial policy.

*Id.* at 417. Thus, the court held that "the evidence challenged in this case was taken by the officers by unlawful search and seizure and contrary to [Article I, Section 11 of the Wisconsin Constitution] and was improperly received in evidence against him on the trial in violation of his rights under [Article I, Section 8 of the Wisconsin Constitution]." *Id.* at 415.[11]

---

[11] We break here to note that *Hoyer v. State,* 180 Wis. 407, 193 N.W. 89 (1923), is not the only instance where this court has declared constitutional protections "long before the United States Supreme Court has seen fit to make those standards mandatory upon the states." *State v. Taylor,* 60 Wis. 2d 506, 522–23, 210 N.W.2d 873 (1973).

In the context of Article I, Section 8, which we have already noted is the counterpart to the Fifth Amendment, this court in *Reichhoff v. State,* 76 Wis. 2d 375, 379, 251 N.W.2d 470 (1977), observed:

> As early as 1891, this court has condemned efforts by a prosecutor to make use of a defendant's invocation of his constitutional privilege to remain silent at trial. Prior to *Miranda v. Arizona,* [384 U.S. 436 (1966)], the law in this state was that "evidence concerning the [accused's] failure to respond to a non-accusatory charge [at the time of apprehension] is not admissible." *Galloway v. State,* 32 Wis. 2d 414, 425a, 145 N.W.2d 761, 147 N.W.2d 542 (1966). Subsequent to *Miranda* this court has recognized as constitutional error the introduction of testimony relating to defendant's silence when in custody. *Scales v. State,* 64 Wis. 2d 485, 219 N.W.2d 286 (1974); *State v. Johnson,* 60 Wis. 2d 334, 342–344, 210 N.W.2d 735 (1973); *Buckner v. State,* 56 Wis. 2d 539, 548, 549, 202 N.W.2d 406 (1972). *Cf. State v. Dean,* 67 Wis. 2d 513, 536, 537, 227 N.W.2d 712 (1975). The use of custodial silence to impeach a defendant's exculpatory story was held improper in federal criminal prosecutions in *United States v. Hale,* [422 U.S. 171 (1975)] and in state criminal prosecutions in *Doyle v. Ohio,* [426 U.S. 610 (1976)].

## D

¶ 70. As noted above, *Hoyer* united the guarantee against unreasonable searches and seizures with the right against self-incrimination. This fusion of constitutional principles that required suppression of unconstitutionally obtained evidence was known as the "convergence theory." In *Eason,* this court placed *Hoyer's* discussion of "the nascent exclusionary rule" within its historical context, stating:

> At this time, cases discussing the nascent exclusionary rule based it upon a "convergence theory" of the Fourth and Fifth Amendments. *See Andresen v. Maryland,* 427 U.S. 463, 472–73 (1976). That approach was subsequently abandoned.
>
> . . . .
>
> In fact, *Gouled v. United States,* 255 U.S. 298 [] (1921)[,] and another case that *Hoyer* relied upon, *Boyd v. United States,* 116 U.S. 616 [] (1886), were overturned in part by *Warden v. Hayden,* 387 U.S. 294, 301–02 [] (1967). *Warden* held that "mere evidence" seized from the accused, as opposed to contraband or the fruits of the crime did not, as previously held, violate the Fifth Amendment against self-incrimination. [*Warden,*] 387 U.S. at 301–03.

*Eason,* 245 Wis. 2d 206, ¶ 40 n.6.

In the context of Article I, Section 7, the complement to the Sixth Amendment, this court, in a prescient decision, recognized the right to counsel at state expense in 1859 in *Carpenter v. County of Dane,* 9 Wis. 249, [*274] (1859). This court held that "[i]t seems eminently proper and just that the county, even in the absence of all statutory provision imposing the obligation, should pay an attorney for defending a destitute criminal." *Id.* at 252 [*277]. *Carpenter* arrived over 100 years before the Supreme Court in *Gideon v. Wainwright,* 372 U.S. 335 (1963), required the appointment of counsel as a constitutional right.

121

¶ 71. *Eason* made clear that the federal underpinnings for the Fifth Amendment's involvement with the federal exclusionary rule have been discredited. *Id.* However, in the very next breath, the *Eason* court stated: "Here, there is no contention that the evidence seized violated Eason's Fifth Amendment rights or his rights under Article I, Section 8. Accordingly, that part of *Hoyer*'s analysis is inapposite." *Id.* With Knapp making that very argument here, that part of *Hoyer*'s analysis is anything but inapposite.

E

¶ 72. We have recently shown little tolerance for those who violate the rule of law. In *State v. Reed,* 2005 WI 53, ¶ 36, 280 Wis.2d 68, 695 N.W.2d 315, we depicted the Fifth Amendment as providing a shield that protects against compelled self-incrimination.[12] By its very nature, the *Miranda* warnings secure the integrity of that shield—and to be sure, that shield is made of substance, not tinsel. *See Hoyer,* 180 Wis. at 413. Any shield that can be so easily pierced or cast aside by the very people we entrust to enforce the law fails to serve its own purpose, and is in effect no shield at all. Just as we will not tolerate criminal suspects to lie to the police under the guise of avoiding compelled self-incrimination, we will not tolerate the police deliberately ignoring *Miranda*'s rule as a means of obtaining inculpatory physical evidence. As we have frequently recognized in the past, what is sauce for the goose is also sauce for the gander. *See Revival Center Tabernacle of Battle Creek v. City of Milwaukee,* 68 Wis. 2d 94, 98, 227 N.W.2d 694 (1975).

[12] The same is true of Article I, Section 8 of the Wisconsin Constitution

¶ 73. Therefore, turning to the exclusionary rule, "This state has accepted the doctrine that courts must consider the means used in obtaining evidence and not receive it if obtained by violation of constitutional rights of an accused." *Warner v. Gregory,* 203 Wis. 65, 66, 233 N.W. 631 (1930). Because the goals of the exclusionary rule and fruit of the poisonous tree doctrines are to curb "illegal governmental activity," and because *Dickerson* announced that *Miranda* is a constitutional rule (which we embrace as concluding *Miranda* is constitutional),[13] we conclude that it is appropriate that the exclusionary rule bars physical fruits obtained from a deliberate *Miranda* violation under Article I, Section 8.[14]

---

[13] *See also Jennings,* 252 Wis. 2d 228, ¶ 25 n.6 (describing *Dickerson* as concluding that *Miranda* established a "federal constitutional rule").

[14] This is not the first time we have explicitly departed from federal constitutional jurisprudence to extend greater rights to Wisconsin citizens.

In *State v. Hansford,* 219 Wis. 2d 226, 242, 580 N.W.2d 171 (1998), this court declined to extend the Supreme Court's reasoning in *Williams v. Florida,* 399 U.S. 78 (1970), which held the Sixth Amendment does not require a 12–person jury, to Article I, Section 7 of the Wisconsin Constitution. This court held that Article I, Section 7 guarantees a defendant charged with a misdemeanor was entitled to a 12–person jury.

In *State v. Eason,* 2001 WI 98, ¶ 63, 245 Wis. 2d 206, 629 N.W.2d 625, this court departed from the Supreme Court's holding in *United States v. Leon,* 468 U.S. 897, 919–20 (1984), where the Supreme Court formulated an exception to the exclusionary rule where a police officer relied in good faith upon a search warrant issued by an independent and neutral magistrate. This court concluded that for the good faith exception to apply, "the State must show that the process used attendant to

¶ 74. However, we arrive at that conclusion guardedly, being mindful that the exclusionary rule is not absolute. In *Knapp I,* this court agreed that "because the physical fruits of a *Miranda* violation will be trustworthy evidence, it appears that in most cases the . . . analysis boils down to a rule excluding the fruits of a *Miranda* violation only when there is a 'strong need for deterrence.' " *Knapp I,* 265 Wis. 2d 278, ¶ 76 n.15 (citation omitted). That strong need for deterrence that overcomes the social costs of excluding evidence is present in this case for the same two policy reasons we identified in *Knapp I.*

1

¶ 75. First, the conduct at issue here is particularly repugnant and requires deterrence. As this court explained in *Knapp I,* "[t]he rule argued for by the State would minimize the seriousness of the police misconduct producing the evidentiary fruits, breed contempt for the law, and encourage the type of conduct that *Miranda* was designed to prevent, especially where the police conduct is intentional, as it was here." *Knapp I,* 265 Wis. 2d 278, ¶ 74.

¶ 76. Regarding minimizing the seriousness of police misconduct and breeding contempt for the law, Professor Yale Kamisar has written:

obtaining the search warrant included a significant investigation and a review by a police officer trained in, or very knowledgeable of, the legal vagaries of probable cause and reasonable suspicion, or a knowledgeable government attorney." *Eason,* 245 Wis. 2d 206, ¶ 63. Although the Supreme Court did not require this in *Leon,* this court held "that Article I, Section 11 of the Wisconsin Constitution requires this process and thus affords additional protection than that which is afforded by the Fourth Amendment." *Id.*

Consider, for example, a situation where the suspect has invoked his right to counsel, but the police continue to question him in order to retrieve the murder weapon or some other nontestimonial evidence. In this set of circumstances the police have nothing to lose by rejecting the request for counsel (they will lose any statement the suspect might make, but they would have lost any statement anyway if they had honored the suspect's request for counsel and immediately ceased all questioning) and something to gain (the use of physical evidence that the inadmissible statement might turn up).

Yale Kamisar, *Postscript: Another Look at Patane and Seibert, the 2004 Miranda "Poisoned Fruit" Cases,* 2 Ohio St. J. Crim. L. 97, 105 (2004).[15]

¶ 77. Similarly, another commentator stated:

When the police seek to obtain a confession from a suspect in custody, they must decide whether to read the *Miranda* warnings before the interrogation begins. They will be presented with two options. They can either: (1) forego the warnings and any confession the suspect makes; or (2) read the warnings and risk having the suspect exercise his right to remain silent. The certainty that the suspect's confession will be suppressed if the *Miranda* warnings are not read serves as a strong deterrent against committing a *Miranda* violation and encourages police officers to choose the second option.

---

[15] Professor Kamisar is quite passionate about the consequences of this example, as he emphatically asks:

Doesn't the Court care that when the police fail to administer the *Miranda* warnings to custodial suspects, they are disobeying the law while enforcing it? Doesn't the Court care that when the prosecution is allowed to use the physical fruits of police failures to comply with the *Miranda* rules, they "invite the police to turn their backs on *Miranda?*"

Yale Kamisar, *Postscript: Another Look at Patane and Seibert, the 2004 Miranda "Poisoned Fruit" Cases,* 2 Ohio St. J. Crim. L. 97, 105 (2004).

The police have different incentives when they know that nontestimonial fruits of a *Miranda* violation will be admissible at trial. Again, their choices will be twofold: (1) forego the warnings and the suspect's confession, but with the understanding that the confession can be used to discover admissible nontestimonial evidence; or (2) read the warnings and risk losing both the confession and the resultant nontestimonial evidence if the suspect exercises his right to remain silent. Given the potential benefits of the first option, the police will have a significant incentive to ignore the *Miranda* warnings.

. . . .

Police officers seeking physical evidence are not likely to view the loss of an unwarned confession as particularly great when weighed against the opportunity to recover highly probative nontestimonial evidence, such as a murder weapon or narcotics.

. . . .

In short, [failing to suppress the physical fruits will result in] police officers [] com[ing] away with the wrong message: It is better to interrogate a suspect without the *Miranda* warnings than to use legitimate means to investigate crime. Permitting such interrogation would send an ominous signal to the police and prosecutors that citizens may be "exploited for the information necessary to condemn them before the law."

David A. Wollin, *Policing the Police: Should Miranda Violations Bear Fruit?*, 53 Ohio St. L.J. 805, 843 (1992) (citation omitted).[16]

---

[16] Wollin also warns:

Indeed, there are many reported cases where the police have arrested suspects and interrogated them without the *Miranda* warnings in order to discover the existence or location of nontes-

¶ 78. Regarding the type of conduct *Miranda* was designed to protect, this idea was soundly explained by the dissent in *Patane* as follows:

> *Miranda* rested on insight into the inherently coercive character of custodial interrogation and the inherently difficult exercise of assessing the voluntariness of any confession resulting from it. Unless the police give the prescribed warnings meant to counter the coercive atmosphere, a custodial confession is inadmissible, there being no need for the previous time-consuming and difficult enquiry into voluntariness. That inducement to forestall involuntary statements and troublesome issues of fact can only atrophy if we turn around and recognize an evidentiary benefit when an unwarned statement leads investigators to tangible evidence.

*Patane,* 124 S. Ct. at 2631–32 (Souter, J., dissenting). The natural consequence of concluding otherwise, the dissent stated, was to extend "an unjustifiable invitation to law enforcement officers to flout *Miranda* when there may be physical evidence to be gained." *Id.* at 2632. We wholeheartedly agree.

2

¶ 79. Second, aside from deterring police misconduct, there is another fundamental reason for excluding the evidence under circumstances present here, the preservation of judicial integrity. As this court indicated in *Knapp I:*

---

timonial evidence. This should not come as a surprise to those knowledgeable about police practices. Expert interrogators have long recognized, and continue to instruct, that a confession is a primary source for determining the existence and whereabouts of the fruits of a crime, such as documents or weapons.

David A. Wollin, *Policing the Police: Should Miranda Violations Bear Fruit?,* 53 Ohio St. L.J. 805, 845 (1992) (citation omitted).

It was of this [judicial integrity] that Mr. Justice Holmes and Mr. Justice Brandeis so eloquently spoke in *Olmstead v. United States*. . . . "For those who agree with me," said Mr. Justice Holmes, "no distinction can be taken between the Government as prosecutor and the Government as judge." . . . "In a government of laws," said Mr. Justice Brandeis, "existence of the government will be imperiled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for the law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the Government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this Court should resolutely set its face."

*Knapp I,* 265 Wis. 2d 278, ¶ 77 (quoting *State v. Ward,* 2000 WI 3, ¶ 47, 231 Wis. 2d 723, 604 N.W.2d 517 (citations and quotations omitted)).[17]

¶ 80. The *Hoyer* court intimated similar concerns nearly a century ago, where it stated:

We see no reason in logic, justice, or in that innate sense of fair play which lies at the foundation of such guarantees, why a court of justice, rejecting as abhorrent the idea of the use of evidence extorted by violation of a defendant's right to be secure in person and exempt

---

[17] *See also Mapp v. Ohio,* 367 U.S. 643, 659 (1961) ("The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the charter of its own existence."); and *id.* at 660 ("The ignoble shortcut to conviction left open to the State tends to destroy the entire system of constitutional restraints on which the liberties of the people rest.").

from self-incrimination though it may result in murder going unwhipt of justice, should yet approve of the use, in the same court of justice, by state officers, of that which has been obtained by other state officers through, and by, a plain violation of constitutional guarantees of equal standing and value, though thereby possibly a violation of the prohibition law may go unpunished.

*Hoyer,* 180 Wis. at 417. This indisputable observation carries no less force today.

¶ 81. It is not too much to expect law enforcement to respect the law and refrain from intentionally violating it.[18] When law enforcement is encouraged to intentionally take unwarranted investigatory shortcuts to obtain convictions, the judicial process is systemically corrupted.[19] To guard against this danger, fair play requires the players to play by the rules, especially those players who enforce the rules.

F

¶ 82. Here, it is undisputed that physical evidence was obtained as the direct result of an intentional

---

[18] *See, e.g., United States v. Ventresca,* 380 U.S. 102, 111–12 (1965) ("This Court is alert to invalidate unconstitutional searches and seizures whether with or without a warrant. By doing so, it vindicates individual liberties and strengthens the administration of justice by promoting respect for law and order. This Court is equally concerned to uphold the actions of law enforcement officers consistently following the proper constitutional course. This is no less important to the administration of justice than the invalidation of convictions because of disregard of individual rights or official overreaching.").

[19] *See, e.g., Harris v. United States,* 331 U.S. 145, 172 (1947) ("Stooping to questionable methods neither enhances that respect for law which is the most potent element in law enforcement, nor, in the long run, do such methods promote successful prosecution.").

*Miranda* violation. Therefore, applying our holding above, the physical evidence is inadmissible.

## V.

¶ 83. In summary, we conclude that physical evidence obtained as a direct result of an intentional violation of *Miranda* is inadmissible under Article I, Section 8 of the Wisconsin Constitution. We will not allow those we entrust to enforce the law to intentionally subvert a suspect's constitutional rights. As it is undisputed that the physical evidence here was obtained as a direct result of an intentional violation of *Miranda,* it is inadmissible.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

¶ 84. N. PATRICK CROOKS, J. (*concurring*). I strongly support the majority's conclusion that "physical evidence obtained as a direct result of an intentional violation of *Miranda* is inadmissible under Article I, Section 8 of the Wisconsin Constitution." Majority op., ¶ 83. I write separately to emphasize that the majority opinion serves to reaffirm Wisconsin's position in the "new federalism" movement.[1]

---

[1] The Wisconsin Supreme Court has "a long history of recognizing the vitality of the Declaration of Rights of the Wisconsin Constitution (article 1). . . ." *State v. Pallone,* 2000 WI 77, ¶ 92, 236 Wis. 2d 162, 613 N.W.2d 568 (Abrahamson, C.J., dissenting). The Chief Justice went on to urge that the court "continue our traditional approach of examining our own constitution and our own precedents." *Id.* (citing *Jokosh v. State,* 181 Wis. 160, 163, 193 N.W. 976 (1923); *Hoyer v. State,* 180 Wis. 407, 417, 193 N.W. 89 (1923); John Sundquist, *Construction of the Wisconsin Constitution—Recurrence to Fundamental Prin-*

¶ 85. As the majority notes, the United States Supreme Court has repeatedly recognized the power of states to adopt higher standards to protect individual liberties than those mandated by the federal constitution. *See* majority op., ¶ 57. Indeed, this court frequently analyzes constitutional challenges in terms of both the Wisconsin and the federal constitution. *See, e.g., State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582; *Maurin v. Hall,* 2004 WI 100, 274 Wis. 2d 28, 682 N.W.2d 866; *State v. Greve,* 2004 WI 69, 272 Wis. 2d 444, 681 N.W.2d 479. While the analysis is often the same under both constitutions, it is not an idle exercise for the court—a consistent result is neither mandatory nor assured.

¶ 86. As early as 1977, United States Supreme Court Justice William J. Brennan, Jr. recognized and encouraged the emerging pattern of state court decisions interpreting their own constitutions, and declining to follow federal precedent they found "unconvincing, even where the state and federal constitutions are similarly or identically phrased." William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489, 500 (1977)(footnote omitted). Justice Brennan emphasized the fact that the "decisions of the [U.S. Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically appli-

*ciples,* 62 Marq. L. Rev. 531 (1979); Comment, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure,* 62 Marq. L. Rev. 596 (1979); Comment, *Rediscovering the Wisconsin Constitution: Presentation of Constitutional Questions in State Courts,* 1983 Wis. L. Rev. 483; Joseph A. Ranney, *Trusting Nothing to Providence: A History of Wisconsin's Legal System* 499–500 (1999)).

cable to state law issues, and state court judges and the members of the bar seriously err if they so treat them." *Id.* at 502 (footnote omitted). This trend of state courts "assert[ing] a role for state constitutions in the protection of individual liberties and the resolution of legal disputes," has become known as "new federalism." Shirley S. Abrahamson, *State Constitutional Law, New Judicial Federalism, and the Rehnquist Court,* 51 Clev. St. L. Rev. 339, 341 (2004)(footnote omitted).

¶ 87. Over the past three decades, "new federalism" has gained increasing strength across the nation. In 1992, the Supreme Court of Texas referenced "new federalism" when it stated the following: "When a state court interprets the constitution of its state merely as a restatement of the Federal Constitution, it both insults the dignity of the state charter and denies citizens the fullest protection of their rights." *Davenport v. Garcia,* 834 S.W.2d 4, 12 (Tex. 1992). In 1993, the Ohio Supreme Court embraced "new federalism" when it "join[ed] the growing trend in other states . . . [in recognizing] that the Ohio Constitution is a document of independent force." *Arnold v. City of Cleveland,* 616 N.E.2d 163, 169 (Ohio 1993); *see also State v. Oquendo,* 613 A.2d 1300 (Conn. 1992); *State v. Tucker,* 642 A.2d 401 (N.J. 1994); *State v. Cardenas-Alvarez,* 25 P.3d 225 (N.M. 2001)(holding that while a prolonged checkpoint stop was not illegal under federal border search law, the stop was illegal under its state constitution); *State v. Randolph,* 74 S.W.3d 330 (Tenn. 2002) (rejecting the standard set by the Supreme Court in *California v. Hodari D.,* 499 U.S. 621 (1991) to determine when a person is seized, on state constitutional grounds); *State v. Young,* 957 P.2d 681 (Wash. 1998). In fact, between the years 1970 and 1989, "approximately six hundred published opinions relied on state constitutional grounds to provide protections

broader than federally interpreted guarantees under the United States Constitution." *Davenport,* 834 S.W.2d at 12 n.21, (citing Linda B. Matarese, *Other Voices: The Role of Justices Durham, Kaye and Abrahamson in Shaping the "New Judicial Federalism,* 2 Emerging Issues in St. Const. L. 239, 246 (1989)).

¶ 88. "New federalism" is a concept embraced by both liberals and conservatives. "For the conservative, state constitutionalism represents the triumph of federalism; crucial decisions about the apportionment of rights and benefits are decided by state courts responsive to local needs, rather than by a distant United States Supreme Court. . . ." Stanley Mosk, *State Constitutionalism: Both Liberal and Conservative,* 63 Tex. L. Rev. 1081 (1985). Clearly, "new federalism" represents the intersection of "conservatives' concern over federalism and states' rights" with "the liberals' concern over safeguarding individual rights." *Id.* at 1092.

¶ 89. Perhaps the most significant case related to the majority opinion in the present case is *Commonwealth v. Martin,* 827 N.E.2d 198 (Mass. 2005), in which the Supreme Judicial Court of Massachusetts recently concluded that "the [U.S.] Supreme Court's construction of the Miranda rule [in *Patane*] . . . is no longer adequate to safeguard the parallel but broader protections afforded Massachusetts citizens . . ." by its state constitution. *Id.* at 200. In that case, police in Boston responded to a "911" call from a person who claimed a man had threatened him with a gun. Police determined it was likely that Martin, who had locked himself in his apartment, had threatened the caller. *Id.* at 201. Police eventually convinced Martin to surrender, and when he opened his apartment door and stepped into the hallway, he was handcuffed. *Id.* Police then conducted a

protective sweep of Martin's apartment, and Martin was positively identified by the caller as the person who had threatened him. *Id.*

¶ 90. Although Martin was in custody at that point, he was not advised of his rights under *Miranda. Id.* Detectives then informed Martin that they would apply for a search warrant to locate the weapon, but encouraged Martin to expedite the process and tell them where he had put the firearm. *Id.* Martin replied by telling the detective that he had had problems with the caller in the past. *Id.* "The detective responded by assuring Martin that the police 'would look into that,' but reiterated that his main concern was locating the firearm. Martin then told the detective that the firearm was in his bedroom closet." *Id.* The detective entered Martin's apartment and located a loaded firearm in the closet. It was only at this point that Martin was read his *Miranda* rights and formally placed under arrest. *Id.* "He was subsequently indicted for assault by means of a dangerous weapon (firearm), unlawful possession of a firearm while being an armed career criminal, and unlawful possession of ammunition." *Id.* (footnote omitted).

¶ 91. The *Martin* court similarly held that evidence obtained as a result of "unwarned statements where Miranda warnings would have been required by Federal law in order for them to be admissible, is presumptively excludable from evidence at trial as 'fruit' of the improper failure to provide such warnings." *Id.* at 200. Although its reasoning was based upon Massachusetts Constitution Article XII's protection against self-incrimination, the rationale of deterring police misconduct articulated by this majority is the same. *See id.* at 204; *see* majority op. ¶¶ 75–78. " 'To allow the police the freedom to disregard the require-

ments of *Miranda* and thereby risk losing only the direct product of such action, but not the evidence derived from it, would not only not deter future *Miranda* violations but might well tend to encourage them.'" *Martin,* 827 N.E.2d at 204 (quoting *State v. Gravel,* 601 A.2d 678, 685 (N.H. 1991)).

¶ 92. Here, the majority holding ensures our state's citizens the protections guaranteed to them by the Wisconsin Constitution. In refusing to apply mechanically decisions based on federal law to rights guaranteed by our state constitution, the court continues to place Wisconsin in good company with the many states which have embraced "new federalism."

¶ 93. For the foregoing reasons, I respectfully concur.

¶ 94. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justices ANN WALSH BRADLEY and LOUIS BUTLER, JR. join this concurrence.

¶ 95. JON P. WILCOX, J. (*dissenting*). I do not join the majority opinion in this case because the court has failed to adhere to the doctrine of stare decisis. This court has previously established that Article I, Section 8 of the Wisconsin Constitution[1] does not create broader rights than those provided by the Fifth Amendment of the United States Constitution.[2] Accordingly, I would

---

[1] Article I, Section 8 of the Wisconsin Constitution provides in relevant part: "No person may be held to answer for a criminal offense without due process of law, and no person for the same offense may be put twice in jeopardy of punishment, nor may be compelled in any criminal case to be a witness against himself or herself."

[2] The Fifth Amendment to the United States Constitution provides in relevant part: "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be

affirm the order of the circuit court in conformity with the holding of *United States v. Patane,* 542 U.S. 630, 124 S. Ct. 2620 (2004).

¶ 96. As I explained in my dissent in *Johnson Controls, Inc. v. Employers Insurance of Wausau,* 2003 WI 108, ¶¶ 133–164, 264 Wis. 2d 60, 665 N.W.2d 257, stare decisis is important because " '[r]espect for precedent promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Id.,* ¶ 138 (Wilcox, J., dissenting) (quoting *State v. Outagamie County Bd. of Adjustment,* 2001 WI 78, ¶ 29, 244 Wis. 2d 613, 628 N.W.2d 376) (internal quotation omitted). Furthermore, "[w]hen legal standards 'are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.' " *Id.* (Wilcox, J., dissenting) (quoting *State v. Stevens,* 181 Wis. 2d 410, 441–42, 511 N.W.2d 591 (1994)(Abrahamson, J., concurring)).

¶ 97. I do not question the majority's assertion that this court has the power to impose greater protections under the Wisconsin Constitution than those required under the United States Constitution. *See* majority op., ¶ 57. However, this case is not about a question of power or a question of "new federalism." It is a question of adherence to precedent. This court has already determined that the right against self-incrimination afforded by Article I, Section 8 of the Wisconsin Constitution is, as the majority puts it, in "lock-step," majority op., ¶ 59, with the Fifth Amendment of the United States Constitution. *See State v. Sorenson,* 143 Wis. 2d 226, 421 N.W.2d 77 (1988).

---

deprived of life, liberty, or property, without due process of law."

¶ 98. In *Sorenson,* the defendant contended that "the state violated his constitutional rights to due process and to remain silent by commenting during cross examination and during closing argument upon his silence." *Id.* at 255. The defendant argued that the self-incrimination provision in the state constitution provided broader protections than its counterpart in the federal constitution. The *Sorenson* court dismissed this argument as follows:

> In the past, our cases interpreting the right to remain silent have paralleled federal analysis used for the United States Constitution and Amendments. *See, e.g., Odell v. State,* 90 Wis. 2d 149, 153, 279 N.W.2d 706 (1979); *Rudolph v. State,* 78 Wis. 2d 435, 442, 254 N.W.2d 471 (1977); *Reichhoff v. State,* 76 Wis. 2d 375, 379–80, 251 N.W.2d 470 (1977). Further, in comparing the language of the federal self-incrimination provision with that of the Wisconsin section, we note the federal amendment uses the word 'shall,' while the Wisconsin Constitution uses the word 'may.' While both protect against self-incrimination there can be no logical argument that the state constitutional provision creates a broader right since the language of the Wisconsin Constitution is certainly no stronger than that used in the United States Constitution. As a result, we find no basis for interpreting state constitutional language beyond the articulated scope of federal constitutional guarantees in this case.

*Sorenson,* 143 Wis. 2d at 259–60. As such, this court refused to interpret Article I, Section 8 any broader than the United States Supreme Court's interpretation of the Fifth Amendment.

¶ 99. In the more recent case of *State v. Jennings,* 2002 WI 44, 252 Wis. 2d 228, 647 N.W.2d 142, we again declined to interpret Article I, Section 8 of our state constitution broader than the Fifth Amendment of the

federal constitution. In *Jennings,* the defendant argued that this court should "establish a state constitutional rule requiring the police to clarify ambiguous references to counsel during custodial interrogations." *Id.,* ¶ 37. As noted by the majority, in *Jennings* we stated that when the language of the Wisconsin Constitution and the United States Constitution is " 'virtually identical' . . . Wisconsin courts have normally construed" the constitutions consistent with each other. *Id.,* ¶ 39 (quoting *State v. Agnello,* 226 Wis. 2d 164, 180–81, 593 N.W.2d 427 (1999) (citing *State v. Tompkins,* 144 Wis. 2d 116, 133, 423 N.W.2d 823 (1988))). This court, in *Jennings,* then applied the same analysis utilized in *Sorenson. Jennings,* 252 Wis. 2d 228, ¶ 41. Accordingly, we again refused to interpret Article I, Section 8 of our constitution as providing more rights than its federal counterpart. As such, we declined to impose, as a matter of state constitutional law, a rule requiring police to cease a custodial interrogation and clarify a suspect's equivocal or ambiguous references to counsel under Article I, Section 8 of the Wisconsin Constitution. *Id.,* ¶ 42.[3]

¶ 100. In addition to this court's parallel interpretation of the self-incrimination clauses of the state and federal constitutions, we have also consistently interpreted Wisconsin's due process clause, contained in Article I, Section 8, in conformity with the Fifth Amendment to the federal constitution. *See State v.*

---

[3] For additional authority concerning the co-extensive rights of the self-incrimination clauses in Article I, Section 8 and the Fifth Amendment, see *State v. Hall,* 207 Wis. 2d 54, 67–68, 557 N.W.2d 778 (1997); *State v. Schultz,* 152 Wis. 2d 408, 416 n.6, 448 N.W.2d 424 (1989); *State v. Fencl,* 109 Wis. 2d 224, 237 n.9, 325 N.W.2d 703 (1982); *State v. Mallick,* 210 Wis. 2d 427, 429 n.1, 565 N.W.2d 245 (Ct. App. 1997).

*Hezzie R.*, 219 Wis. 2d 848, 580 N.W.2d 660 (1998). "This court has repeatedly stated that the due process clauses of the state and federal constitutions are essentially equivalent and are subject to identical interpretation." *Id.* at 891 (citing *Reginald D. v. State*, 193 Wis. 2d 299, 307, 533 N.W.2d 181 (1995)). *See also Dowhower v. West Bend Mut. Ins. Co.*, 2000 WI 73, 236 Wis. 2d 113, 613 N.W.2d 557 (noting that Wisconsin Supreme Court cases interpreting the Fourteenth Amendment to the United States Constitution and Article I, Section 1 of the Wisconsin Constitution have found no substantial differences between the due process protections provided in each document).

¶ 101. In my view, the majority has not " 'come forward with the type of extraordinary showing that this [c]ourt has historically demanded before overruling one of its precedents.' " *Johnson Controls*, 264 Wis. 2d 60, ¶ 137 (Wilcox, J., dissenting) (quoting *Payne v. Tennessee*, 501 U.S. 808, 848 (1991) (Marshall, J., dissenting)). Ultimately, I am troubled by this court's recent trend of departing from our long history of interpreting similarly-worded provisions of the state and federal constitutions in concert. *See State v. Dubose*, 2005 WI 126, ¶ 40, 285 Wis. 2d 143, 699 N.W.2d 582 (providing for a broader interpretation of Article I, Section 8 of the Wisconsin Constitution than the Due Process Clause of the United States Constitution, even though this court has never interpreted the two provisions differently).

¶ 102. We should not suddenly change our well-settled manner of interpreting Article I, Section 8, simply to avoid the impact of the United States Supreme Court's recent decision in *Patane*. Such a tactic seriously undermines the "prestige, influence, and func-

tion of the judicial branch of state government." *People v. Norman,* 112 Cal. Rptr. 43, 49 (Cal. Ct. App. 1974).

¶ 103. To paraphrase the California Court of Appeal in *Norman:*

> [I]f the meaning of the Constitution is as fluid as the personal whims of the Court's membership would make it, it is really no constitution at all. A set of principles setting governmental authority within those bounds is meaningless if [seven] Delphic oracles are permitted to divine its meaning and state it anew each time a question is proposed for resolution. . . . For the same reason, the state system should accept the interpretation of the United States Supreme Court of language in the federal Constitution as controlling of our interpretation of essentially identical language in the [Wisconsin] Constitution unless conditions peculiar to [Wisconsin] support a different meaning. Judges do not represent people, they serve people. To do so, they must not represent a political or social point of view; they must serve the rule of law.

*Id.* (internal quotations and citations omitted).[4]

¶ 104. Finally, I note that contrary to the majority's assertion, *Missouri v. Seibert,* 542 U.S. 600, 124 S. Ct. 2601 (2004), simply has no application to the case at bar. First, *Seibert* focused on a two-tiered police interrogation scheme. The scheme was implemented as follows: 1) the police questioned a suspect until a confession was obtained; and 2) the *Miranda* warnings were then read to the suspect, after which the police

---

[4] I recognize that this opinion of the California Court of Appeal was later vacated by the California Supreme Court in *People v. Norman,* 538 P.2d 237 (Cal. 1975). I quote this opinion solely for the persuasiveness of its reasoning. However, I note that the above-quoted language was also reproduced in the dissent in *Norman,* 538 P.2d at 246 (Clark, J. dissenting).

repeated the previous questioning until the suspect gave the same confession. *Seibert,* 124 S. Ct. at 2602. The Supreme Court held that Seibert's postwarning statements were inadmissible. *Id.* at 2613.

¶ 105. In this case, Detective Roets did not utilize such a scheme; he asked Knapp what he had been wearing the prior evening, without first reading Knapp the *Miranda* warnings. *See* majority op., ¶¶ 7–8. In response, Knapp pointed to a pile of clothing that Detective Roets then seized. *Id.,* ¶ 8. These two scenarios are not comparable, and as such, the analysis developed in *Seibert* has no application to this case. Second, *Seibert* focused on the admissibility of *verbal statements.* This case concerns the admissibility of *physical evidence.* As the Supreme Court explained in *Patane,* "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context." *Patane,* 124 S. Ct. at 2626. Thus, because *Seibert* and the case at bar involve different types of evidence and different procedures for obtaining that evidence, *Seibert* has no application to the present case.

¶ 106. In sum, I am of the opinion that our prior decisions concerning the interpretation of Article I, Section 8 of the Wisconsin Constitution are clear and should not be abandoned. I am not persuaded that this court should depart from our practice of interpreting Article I, Section 8 of the Wisconsin Constitution in conformity with the United States Supreme Court's interpretations of the Fifth Amendment of the United States Constitution. As such, I am compelled to dissent.

¶ 107. I am authorized to state that Justice PA-TIENCE DRAKE ROGGENSACK joins in this dissent.

¶ 108. DAVID T. PROSSER, J. (*dissenting*). I respectfully dissent for the reasons stated in my dissent in *State v. Dubose,* 2005 WI 126, 285 Wis. 2d 143, 699 N.W.2d 582.